# WHEELING.

PECK, TRUSTEE, *v.* LIST *et al.*

Submitted January 29, 1883—Decided December 20, 1883.

1. If the owner of goods or of an estate put up for sale at auction by
his direction employ one or more puffers to bid for him, it is a
fraud on the real bidders, and the highest bidder cannot be
compelled to complete the contract.  (p. 375.)

2. A by-bidder employed by any one interested in the proceeds of an
auction-sale, who has good reason to believe and does believe
from assurances made or from an understanding expressed or
implied, that neither he nor his employer will be held respon-
sible for the bid he makes, if it happens to be the highest bid,
by the auctioneer not knocking down the property on such bid
or by escaping the responsibility of his bid in any other man-
ner, if the power exists in his employer to make good this assur-
rance or understanding, is substantially a puffer ; and the em-
ployment of such person for such purpose under these circum-
stances is a fraud upon the sale ; and the highest bidder can not
be compelled to complete the contract.  (p. 396.)

3. If a puffer be employed by the owner or a by-bidder be employed
by one interested in the sale under such circumstances, though
but one such puffer or by-bidder be employed, and though such
puffer or by-bidder be expressly instructed to bid only up to a
certain fixed sum, and for the purpose only of preventing the
property selling at the auction for an under-value, yet the bid-
ding of such puffer or by-bidder will render the sale fraudulent
and void, unless it is publicly announced at the time of the
sale, that there will be such puffer or by-bidder, who will bid at
the auction.  (p. 396.)

4. A *bona fide* bidder, to whom property has been knocked down at
such auction, where there has been such a puffer or by-bidder,
who has bid, is not bound by his bid or purchase, though it be
proven, that he bought the property at a .reasonable price, for
under such circumstances such purchaser has a right to repudi-
ate his purchase, if he does so promptly on ascertaining that
there was such puffer or by-bidder, who bid at such .auction.
(p. 396.)

GREEN, JUDGE, furnishes the following statement of the case:

At August rules, 1881, Daniel Peck filed his bill in the municipal court of Wheeling, in which he alleged, that Samuel Lewis and Susannah, his wife, and Louis Woodmansee and Harriet, his wife, by a deed of trust dated June 17, 1868, and duly recorded in the clerk's office of the county court of Ohio county conveyed to him, Daniel Peck, as trustee lot No. 40 on the corner of Main and Tenth streets in the city of Wheeling, which lot fronts sixty-seven feet on Main street and one hundred and thirty-three feet on Tenth street, and lot No. 120 lying on the corner of Tenth street and Market square, it being sixty-seven feet square. These two lots together fronting on Main street sixty-seven feet and running back that width along Tenth street to Market square a distance of two hundred feet; that on January 21, 1869, the same grantors by another deed of trust conveyed to Daniel Peck, the same two lots, which deed of trust was also duly recorded; that the first of these deeds of trust was to secure a promissory note of the male grantors to the executors of Samuel Gill for five thousand dollars dated June 17, 1868, and payable twelve months after date at the First National Bank of Bridgeport, Belmont county, Ohio, with interest from date; that the second of these deeds of trust was to secure another promissory note by the same makers to Joseph Gill for three thousand dollars, dated January 21, 1869, and payable four months after date. Attested copies of these deeds of trust were filed with the bill.

The bill further alleged, that one of the grantors in this deed of trust Samuel Lewis, who owned one moiety of these two lots died October 14, 1878, leaving a will whereby he devised all his property to his wife, Susannah Lewis, and appointed her his executrix and that she qualified as such; that the debts secured by these two deeds of trust to Daniel Peck, trustee, were assigned to William Bailey subsequently, and that the said grantors also conveyed the same two lots to Hannibal Forbes, trustee, to secure certain other debts to said William Bailey. The bill also alleged, that William Bailey afterwards transferred and assigned all these debts to said Susannah Lewis, who then became entitled to the benefit of the liens on these two lots created by these four deeds

of trust, two to Daniel Peck, trustee, and two to Hannibal Forbes, trustee. But subsequently to the executing and recording of these four deeds of trust the grantors in them executed a fifth deed of trust to D. D. T. Cowan, trustee, on the same two lots and lot No. 119 adjoining this lot No. 120 to secure the payment of certain notes held by the First National Bank of St. Clairsville, Ohio, on which notes Joseph Woodmansee and George Brown and Daniel Steenrod were securities.

Daniel Peck, trustee, the plaintiff in this case, by direction of Susannah Lewis advertised these two lots Nos. 40 and 120 for sale in the Wheeling *Intelligencer,* the sale to take place on May 14, 1881. By a blunder he included in the lots to be sold lot No. 119, which was not conveyed to him but was only included in this fifth deed of trust to D. D. T. Cowan to secure certain notes, which had never been transferred to Susannah Lewis, but were due to the First National Bank of St. Clairsville. Before these three lots Nos. 40, 120 and 119 were thus advertised, George Brown, in his own right and as executor of Joseph Woodmansee, deceased, Hannah Woodmansee as executrix of Joseph Woodmansee and Daniel Steenrod had instituted a suit in equity in the municipal court of Wheeling, which is still pending against Louis Woodmansee, Susanah Lewis and others, in which they set up the lien of this fifth deed of trust to D. D. T. Cowan for their benefit and claimed in effect, that all the debts secured by the other deeds of trust, two to Daniel Peck and two to Hannibal Forbes, had been fully satisfied, and the said deeds of trust released, satisfied and discharged. But it being considered desirable by all the parties interested, that all of these lots should be sold as speedily as possible the parties opened negotiations, the object of which was to permit the sale of the three lots as advertised to be sold by Daniel Peck on May 14, 1881, and that the proceeds of the sale should be held subject to the orders of the municipal court of Wheeling in said suit. But such agreement not being perfected in time, the plaintiffs in said suit procured an injunction restraining Daniel Peck from making this sale as advertised. This arrangement was afterwards completed, and an agreement was signed by all the parties interested authoriz-

ing said Daniel Peck, trustee, to sell the three lots. The
following is a copy of this agreement.

"Article of agreement made and entered into this 14th day
of May, 1881. Witnesseth: Whereas there is a suit now
pending in the municipal court of Wheeling in chan-
cery, brought to the April rules, 1881, of said court,
wherein Daniel Steenrod, in his own right; George Brown,
in his own right; Hannah Woodmansee and George Brown,
executors of the last will of Joseph Woodmansee, de-
ceased, are plaintiffs, and the First National Bank of St.
Clairsville, D. D. T. Cowan, trustee; Daniel Peck, trustee;
Hannibal Forbes, trustee; William Bailey, Susannah Lewis,
executrix of the last will of Samuel Lewis, deceased;
Susannah Lewis, in her own right; Louis Woodmansee, in
his own right; Louis Woodmansee, survivor of Lewis &
Woodmansee; Joseph I. Gill, executor of Samuel Gill,
deceased, and Joseph Gill, in his own right, are defendants,
wherein, among other things in said suit, it is sought to set
up and enforce a certain deed of trust, bearing date the 14th
day of August, 1878, from Samuel Lewis and Susan-
nah, his wife, and Louis Woodmansee and Hattie, his wife,
to D. D. T. Cowan, and to satisfy its lien, and to sell the
property in the bill in said suit named, and known as the
Grant House property, stables, etc., in the city of Wheeling.
Also another action at law in debt on a judgment from the
court of common pleas of Belmont county, Ohio, brought to
the August rules, 1880, of said municipal court, wherein
Hannah Woodmansee and George Brown, executors as afore-
said, are plaintiffs, and Louis Woodmansee, survivor of
Lewis & Woodmansee, is defendant. Also another action at
law in debt on judgment from the court of common pleas of
Belmont county, Ohio, brought to the May rules, 1881, of
said municipal court, wherein Hannah Woodmansee and
George Brown, executors as aforesaid, are plaintiffs, and
Louis Woodmansee is defendant. Also another action at
law in debt on a note, brought to the September rules, 1880,
of the circuit court of Ohio county, West Virginia, wherein
Hannah Woodmansee and George Brown, executors as
aforesaid, are plaintiffs, and Louis Woodmansee is defendant,
the whole of the claims in said suits mentioned aggregating

at this time, with the interest, according to the claims ot plaintiffs, something over seventeen thousand dollars, but which amount is denied by the defendants to be due or owing, the same being in dispute in said suits.   And whereas said Daniel Peck, trustee in the deeds of trust described in exhibits No. 4 and 5 of the bill filed in said chancery suit in said municipal court, has advertised for sale and is about to sell the larger portion of said Grant House property, stables, etc., in said bill described on the 14th day of May, 1881, at public sale.   And whereas the said plaintiffs in said chancery suit, claiming that said two deeds of trust under which said Peck, as trustee, is about to sell, are paid off, and for this and other reasons are about to apply for an injunction to restrain said sale until a final adjudication of said matters in controversy is had.   And whereas it is desired by all parties concerned in said suits that said property be sold to as good advantage as possible and so as to realize as large a sum as possible, and the same be realized as speedily as possible, and in order to reserve all rights to the respective parties under and by virtue of said suit and actions heretofore named, it is hereby agreed as follows, to-wit:

"The said Daniel Peck, as trustee, may proceed to sell said property under said deeds of trust and advertisement, on the said 14th day of May, 1881, subject to the following conditions:

"Said property is not to be sold for less than nineteen thousand dollars and expenses and commissions of sale, and in case the amount bid does not reach that sum, said property or any part thereof is not to be struck off or sold.   Nor shall any sale by said trustee as such thereafter take place for a less sum than nineteen thousand dollars and said expenses and commissions.

"Immediately after the sale as aforesaid, or any subsequent sale which may be made by said Peck, trustee, the said trustee is to take nineteen thousand dollars of the money or duly secured notes obtained from said sale and place the same in the hands of John Wagner, the cashier of the National Bank of West Virginia (in the city of Wheeling), and such notes to be collected by said Wagner, and said money and proceeds to remain in his hands until the decision of

said chancery suit and actions at law, and then be disposed
of according to the decree in said chancery cause, but in the
meantime said funds may be invested or disposed of as may
hereafter be agreed by the parties or ordered by the said
municipal court.  It is also agreed that the deed of trust
aforesaid from said Samuel Lewis and wife and Louis Wood-
mansee and wife to D. D. T. Cowan shall extend to and con-
tinue and remain in and upon the said nineteen thousand
dollars to the same extent and with the same effect as the
said lien now is on the real estate mentioned therein for such
amount as may be ascertained to be due thereunder.  Any
such notes to be collected by said Wagner.

" This agreement is not to be used to the prejudice of any
of the parties litigant in said suits so as to show there is a
certain amount due or not due them.  It is also agreed that
any liens now held by any of the parties plaintiff in said suits
or actions, or which they or any of them may hereafter
acquire in said actions at law, against said real estate named
in said bill, is to extend to and be in full force against said
funds so placed in the hands of said cashier to the extent the
same were or may become liens against the real estate sold
for said nineteen thousand dollars, and with distinct under-
standing that said liens are so to attach to said funds in the
hands of said cashier to that extent, and said funds are to be
held by him and are hereby set apart and dedicated to the
final determination of said suit in chancery in which the said
actions at law and the decrees, judgments, orders and execu-
tions therein may be set up and marshaled.  It is hereby
agreed that the parties having liens or claiming the same
against the said real estate will release to the purchaser at
said trustee's sale (on the 14th day of May, 1881,) their lien
or liens aforesaid, on the deposit of said funds with the said
cashier as aforesaid ; said fund when so placed in said cashier's
hands is not to be subject to the claims of any other creditor
or creditors of whatever character of said Louis Woodmansee
or Lewis & Woodmansee, but is especially set aside and
appropriated for the purpose aforesaid.

"But nothing herein contained is to be construed to re-
quire a sale by said Peck, trustee, unless with the consent
of Mrs. Susannah Lewis, or to be construed to enable any-

one to require a sale by the trustee who was not heretofore authorized to require such sale.

" This agreement shall be filed in the office of the clerk of said municipal court, and may be made part of the record of said chancery cause on the motion of any party and without formal pleadings.

" Given under our hands and seals, this 14th day of May, 1881.

> " HANNAH WOODMAMSEE, *Executrix.*
>> " BY GEORGE BROWN.
> " GEORGE BROWN,
>> " *In his own right as Executor.*
> " DANIEL STEENROD.
> " SUSANNAH WOODMANSEE,
>> " *In her own right as Executrix.*
> " LOUIS WOODMANSEE,
>> " *In his own right as survivor.*
> " DANIEL PECK, *Trustee.*

" By order of the board.     J. R. MITCHELL, *Cashier.*

" *May* 18, 1881."

There were no other liens than those created by these five deeds of trust, except perhaps a small balance of a judgment for the benefit of one Smith, claimed to be about one hundred dollars; and it was subsequently agreed, in order that the title to be made under the proposed sale by Daniel Peck might be perfect, that if any balance was due on this judgment, it should be paid out of the proceeds of said sale. This sale advertised to take place on the 14th of May, 1881, was postponed for one week to May 21, 1881. Henry K. List, the bill alleges, had knowledge then of all these facts herein stated except perhaps the existence of this small judgment. All material obstacles in the way of a sale and conveyance of all these lots being thus removed, and this postponement of the sale having been publicly announced as well as advertised in the Wheeling *Register* each day from the 14th to the 21st of May, 1881, the sale was made at public auction on the 21st of May, 1881, when Henry K. List became the purchaser of all the lots for twenty-two thousand seven hundred dollars he being the highest and best bidder. A memorandum in writing of such sale signed by Daniel Peck, trustee,

and by Henry K. List by D. C. List jr., his authorized agent, was made at the time and was filed with the bill. It sets forth too the advertisement which had been made of this property: The following is a copy of this memorandum of sale and purchase:

"By virtue of two deeds of trust made to the undersigned, and trustee, by Samuel Lewis with Susannah Lewis, his wife, and Louis Woodmansee with Harriet Woodmansee, his wife, the first dated the 12th day of June, 1868, and recorded in Trust Deed Book No. 1, page 524, in the clerk's office of Ohio county and State of West Virginia; the second deed of trust dated January 21, 1869, and recorded in the same office in Trust Deed Book No. 2, page 95, of the records of the above mentioned county and State, I will sell at public auction, at the front door of the county court-house, in the city of Wheeling, Ohio county, West Virginia, on Saturday, the 14th day of May, 1881, commencing at ten o'clock A. M., the following described property, that is to say: Situate in the city of Wheeling, being the same ground and foundation on which the original Grant House was situated, described in the said deeds of trust as follows: Lot No. forty (40), lying on the corner of Main and what was at that time called Madison street, now Tenth street, lying in the southeast angle of those streets, also lot No. 120 (one hundred and twenty), lying in the southwest angle of the said Tenth street and the market house on Market street, lot No. 40 being sixty-seven feet on Main street and one hundred and thirty-three feet on said Tenth street, and lot No. 120, being sixty-seven feet square, also a part of lot adjoining lot No. 120, being lot No. 119, on the south, forty-four feet on Market street and running back sixty-seven feet, also a parcel of the same lot, lying immediately south of and adjoining the last named lot, being twenty-two feet in width on Market square, running back west sixty-seven feet.

"These parcels will be sold separately or together, as it may be found most advantageous to the property on the day of sale.

"In order to save any and all questions as to title in the conveyance to be made to the purchasers of the above property, the said Susannah Lewis and the said Louis Woodman-

see and his wife, in whom the legal title of the said property remains subject to the said trust, will join as the owners in fee.

" Terms of sale: One third in hand, the remainder in two equal instalments of nine and eighteen months, secured by bonds with security satisfactory to the trustee, the notes carry interest from the day of sale, but the title will be reserved until full payments be made.

"Daniel Peck, *Trustee.*

"W. H. Haller, *Auctioneer.*

" The above sale is adjourned to Saturday, the 21st day of May, 1881.

"Daniel Peck, *Trustee.*

" *May* 14, 1881.

"Purchased the whole of the described property at the sale therein mentioned, for the sum of twenty-two thousand seven hundred dollars ($22,700), according to the terms of sale of Daniel Peck, the trustee, and of the other parties, to be released by the creditors according to an agreement signed by the parties and filed in the case of the executors of the last will of Joseph Woodmansee, deceased, and others against Louis Woodmansee and others.

" Witness our hands this 21st day May, 1881.

"Henry K. List, *by D. C. L. Jr.*

"Daniel Peck, *Trustee.*"

The agreement signed by the parties and filed in *Executors of Joseph Woodmansee* v. *Louis Woodmansee et als.*, referred to in the memorandum of sale is this agreement hereinbefore set forth at length. It will be observed too that two parcels of lot No. 119 purport in the memorandum to have been sold, one fronting forty-four feet on Market street and running back sixty-seven feet and the other lying south of it fronting twenty-two feet on Market street and running back sixty-seven feet. These two parcels made up the whole of lot No. 119, which fronted in all sixty-six feet on Market street and ran back sixty-seven feet. After the sale Henry K. List expressed a wish to pay the whole twenty-two thousand seven hundred dollars in cash, and Daniel Peck, the plaintiff, assented thereto, and thereupon he executed as trustee a deed conveying to List the lots Nos. 40 and 120

and acknowledged the same in the manner prescribed by
law.   Louis Woodmansee and Harriet, his wife, and Susan-
nah Lewis in accordance with their agreement executed and
duly acknowledged a deed conveying to Henry K. List not
only lots Nos. 120 and 40 but also lot No. 119; and the First
National Bank of St. Clairsville in pursuance of said agree-
ment executed a release of said fifth deed of trust, the one
to D. D. T. Cowan, and handed it to Daniel Peck, the plain-
tiff, to be delivered to Henry K. List so as to perfect his title
on his depositing his funds, as provided in this agreement.
In the meantime Joseph Woodmansee, Hannah Woodman-
see and George Brown had obtained a judgment in one of
the courts at law referred to in said agreement, which prob-
ably became a lien on these lots, and the plaintiffs in said
judgment had directed its release.   Daniel Peck, trustee,
also signed a stipulation in writing providing for the pay-
ment of the taxes assessed on these lots for 1881 and for the
payment of this judgment in favor of Smith.   All these
papers were tendered to Henry K. List, which, had he
received them, would have made his title to the lots perfect
and free from all liens and incumbrances; but he refused to
comply with the terms of this sale to him and declined to
take these lots or accept these deeds, solely on the ground
that he believed he had been imposed upon, or taken advan-
tage of in the bidding on said lots by "puffing," that is to
say, he claimed, that some of the bids made thereon were
not *bona fide* but were simply made for the purpose of run-
ning up the price of the property.

The bill then proceeds as follows: "Your orator alleges,
that, though the said lots were not offered without reserve,
yet he neither authorized, nor had he any knowledge of, any
'puffing' bids, but that, so far at least as he was concerned,
such sale was fairly, openly and honestly made.   He has
since been informed, that Mrs. Susannah Lewis, who is
quite an old lady, at whose instance and request your orator
advertsied such sale, through her agent Louis Woodmansee,
requested George R. Tingle, esq., to make bids on the prop-
erty for Mrs. Lewis, which he accordingly did, no objection
being made at the time, so far as your orator is informed.
This fact is all that can give color to the claim of the said

Henry K. List, and your orator insists that it is wholly insufficient to excuse him from the specific performance of his contract. He is informed that the bids made for Mrs. Lewis as aforesaid were made in good faith, in fact, and not for the purpose of 'puffing,' and he insists that she, as the creditor at whose instance he was making said sale, had the full right to bid on the property. Your orator further shows that the said Henry K. List is an active, intelligent, successful and self-reliant business man, accustomed to large business operations, and well acquainted with the value of real estate in Wheeling, where he has resided and been engaged in active business for many years, and that he is peculiarly well acquainted with the property purchased by him as aforesaid. He further says that the price (twenty-two thousand seven hundred dollars) is merely a reasonable one, and less than the value heretofore placed on it by the owners, and that the said Henry K. List has in no way suffered any detriment by his said purchase. Your orator is informed and believes that, in fact, the parties in interest were reluctant to accept the bid of the said Henry K. List at twenty-two thousand seven hundred dollars. Wherefore, inasmuch as your orator is without adequate remedy at law, he prays that the said Henry K. List, the First National Bank of St. Clairsville, Ohio; Susannah Lewis, in her own right and as executrix of Samuel Lewis, deceased; Louis Woodmansee, in his own right and as surviving partner of Lewis & Woodmansee; Harriet Woodmansee, the wife of the said Louis; George Brown, in his own right and as executor of Joseph Woodmansee; Hannah Woodmansee, executrix of Joseph Woodmansee, deceased, and Daniel Steenrod be made parties defendants and required to answer this bill, that the contract for the sale of the said three lots No. 40, No. 120 and No. 119, made by your orator with the said Henry K. List as aforesaid, be specifically enforced against the said Henry K. List, and for such other and general relief as in the premises may seem meet and the rules of equity permit." '

On December 21, 1881, Henry K. List filed his answer to this bill. It corrects an error in the bill in this, that besides lots No. 40 and 120 conveyed by the two deeds of trust to

H. Forbes, trustee, to secure certain debts to Bailey, there was also conveyed the forty-four feet front of lot No. 119 lying adjoining lot 120, and an undivided half of the balance of lot No. 119, which lay to the south of the other part and fronted twenty-two feet on Market street, the whole of the lot No. 119 adjoining the lot 120 and fronting sixty-six feet on Market street and running back sixty-seven feet. It is admitted, that the debts secured by the two deeds of trust to the plaintiff as trustee were subsequently assigned to Bailey, who thereby became entitled to the liens; and it is true that said Bailey afterwards executed an instrument in writing purporting to transfer the same together with the debts due to him and secured on the property aforesaid by deeds to Forbes, trustee, to the said Susannah Lewis, which instrument was duly recorded March 5, 1881, a copy of which is filed with the answer; but the respondent, List, denied that such instrument in writing did transfer and assign to Susannah H. Lewis the benefits of the liens of said deeds of trust. He charged the fact to be that the money paid by the said Susannah H. Lewis to the said Bailey as the consideration of said purported assignment was partly her own and partly said Louis Woodmansee's, who is her son-in-law, a member of her family, who has charge of her business-affairs. She was the owner of an undivided moiety of three lots, and Louis Woodmansee was the owner of the other undivided moiety. The payment aforesaid to said Bailey extinguished the liens of the four deeds of trust, in which the plaintiff, Daniel Peck, and H. Forbes were trustees, the debts being paid by the owners of the property encumbered thereby and not by said Susannah Lewis alone. This respondent admitted the execution of the agreement but denied that this agreement was as alleged in the bill to convey to any purchaser, *whose bid might be accepted*, said lot No. 119 as well as lots 40 and 120. He admits that he was before the sale informed, that an agreement had been entered into by the persons owning the property and having liens thereon, so that at said sale the purchaser would get a perfect title made to him of all the lots free from incumbrances. But this is all the knowledge he had, and he denies he had any knowledge of the particulars of this agreement "C."

"He admits that plaintiff did offer said three lots for sale at public auction on the 21st day of May, 1881, at the front door of the court-house of Ohio county, and that the sale which had been appointed for the 14th day of May, 1881, was postponed as stated in said bill to the 21st day of May, 1881; that on the 21st day of May, 1881, the said three lots were knocked off to him by said plaintiff at the bid, twenty-two thousand seven hundred dollars, for them as a whole, that being the highest bid for said lots *as a whole* offered on said day. The bid aforesaid was made for him by D. C. List jr., son of this respondent, this respondent himself not being present when said bid was made. It is true that the memorandum in writing of said sale filed with the bill, marked "Exhibit D," was made and signed as stated in the bill, and that the agreement referred to or mentioned in the said memorandum is the agreement a copy of which is filed herewith as "Exhibit C," but this respondent says that neither he or said D. C. List jr. knew the contents of said agreement until long after the signing of said memorandum, nor did either respondent nor said D. C. List jr. learn the contents of said agreement until after said respondent had repudiated said purchase of said lots as hereinafter stated. The plaintiff himself drafted the memorandum of sale and presented it to the said D. C. List jr. for signature in the absence of this respondent, and the said D. C. List jr., who signed said memorandum, had no information in reference to said agreement, except that the parties having liens on said lots agreed to release the same and were to get their money out of the proceeds of sale."

This answer then proceeds as follows:

"The respondent says it is true that after the alleged sale he expressed a wish on his part to pay the whole purchase-money in cash, and the plaintiff agreed to receive the whole in cash. The 21st day of May, 1881, was on Saturday, and on Monday morning following the plaintiff came to the office of this respondent and asked whether respondent wanted him to look up the title to the said three lots, but respondent informed him that he desired to get Mr. A. J. Clarke to examine the title for him, and respondent then and there expressed to the said plaintiff his wish to pay the whole pur-

chase-money in cash, provided everything was found to be right. This wish of respondent's, provided everything about sale and title was found to be all right, was expressed before he knew that there was anything wrong about this alleged sale and before he had any knowledge whatever about the matters hereinafter named. Respondent says the two deeds marked 'Exhibit E' and 'F' were executed and acknowledged by the grantor therein, that said First National Bank of St. Clairsville did execute a release of the said deed of trust to D. D. T. Cowan, and placed the same in the hands of plaintiff, but respondent says said release was not sufficient to release the liens of said deed of trust, nor was the same in proper form or satisfactory to this respondent, or such as would be accepted by him. It is true that the executors of Joseph Woodmansee recovered a judgment as stated in the bill, and this respondent has been informed that said executors had authorized their attorneys in writing to release the lien of said judgment upon the deposit of funds as provided in said agreement, but this respondent never saw this authority. It is true the stipulation as to taxes and balance due I. G. Smith on judgment was prepared and signed by plaintiff as stated in the bill. It is true that said plaintiff tendered to this respondent certain papers on the —— day of June, 1881, which he claimed to be deeds, but this respondent did not examine them nor did he know their contents, but the plaintiff held the papers in his hand and did not exhibit any of them to this respondent, but he requested this respondent to comply with the terms of sale of May 21, 1881, and this respondent says it is also true that he has wholly refused to comply with the terms of said sale, and declined to take said lots and to accept the deeds aforesaid on the ground that he had been imposed upon and taken advantage of in the bidding on said lots by puffing, and that the sale was fraudulent and in no way binding on him.

"This respondent here explicitly denies the allegation of said bill to the effect that although the said lots were not offered without reserve, yet the complainant neither authorized nor had any knowledge of any puffing bids, but that so far as he, said plaintiff was concerned, the sale was fairly, openly and honestly made; and this respondent, on the con-

trary, alleges that the said plaintiff had knowledge of puffing, illegal and fraudulent bids having been made at said alleged sale, and that so far as said plaintiff was concerned said sale was not fairly, openly and honestly made, and respondent further alleges that said sale was without reserve, except that it must bring nineteen thousand dollars.

"This respondent does not know what information the plaintiff has received since the alleged sale as to the employment by Susannah Lewis of G. R. Tingle to bid for her on the property, but this respondent denies that said Susannah Lewis, through her agent, Louis Woodmansee, requested G. R. Tingle to make bids on the property for her, and further denies that said Tingle did bid at said sale for her; but this respondent alleges the fact to be that the said G. R. Tingle was bidding, and did bid on the property for said Louis Woodmansee.

"The respondent says that no objection was made at the time said Tingle made his bids because this respondent and his agent, D. C. List jr., and the said complainant himself did not know at the time said bids were made by said Tingle that said Tingle was bidding for any other person than himself, and the said Tingle being a person who was regarded by this respondent and his agent as being fully able to purchase and pay for said property.

"The respondent says that the fact that George R. Tingle bid on said property for Susannah Lewis was not all that could give color to the claim of this respondent made to the said plaintiff in relation to said alleged sale, but this respondent insists that if this had been the only fact connected with said sale upon which the claim of this respondent is founded, it would be entirely sufficient to excuse this respondent from the specific performance of the contract signed by respondent by his agent D. C. List jr., and that fact alone would render said alleged sale and contract fraudulent, invalid and of no binding effect upon this respondent.

"Respondent denies that any bids were made at said sale for said Susannah Lewis in good faith, in fact, and not for the purpose of puffing. He further denies that said Susannah Lewis had any right to bid on said property at said sale. Said respondent admits that he has some experience in busi-

ness and has been accustomed to business operations of considerable magnitude, and is somewhat acquainted with the value of real estate in Wheeling, and that he has resided and been engaged in active business in said city for many years, and he is acquainted with the said three lots; but this respondent says he was not present when the bid was made by his son and agent, D. C. List jr., and had no knowledge that his son was going to bid that amount, he having limited him to twenty thousand dollars, as the price for the whole property; the bidding therefor was not made at all by this respondent nor under his personal direction nor in accordance with his experience and judgment after his limit of twenty thousand dollars was passed. The respondent was not present at all during the afternoon bidding, and was present but a short time during the morning.

"This respondent denies that twenty-two thousand seven hundred dollars is merely a reasonable price for said three lots, but he does not know what speculative and entirely imaginary value was placed upon said property. Said respondent says he would suffer loss if compelled to take and pay for said property twenty-two thousand seven hundred dollars.

"This respondent says, that the said alleged sale was cried by an auctioneer, employed by said plaintiff, at 10 o'clock a. m., when the auctioneer announced that unless the whole property should sell for nineteen thousand dollars there would be no sale, reserving two shanties, one on lot 40 and the other on 120. He also announced that the title to the purchaser should be perfect and free from encumbrances. He then began the sale by offering the parcel of twenty-two feet on Market street of lot 119; next the forty-four feet of same lot 119, and then lot 40 and 120, receiving bids therefor, proclaimed by the auctioneer and amounting in the aggregate to twenty-five thousand nine hundred and ninety-nine dollars.

"This respondent was present for part of the time during the morning and through his said son bid on all the property except the lot 120, and this respondent was the only *bona fide* bidder on any of said property, although there were several of the bids made by several different parties,

who were none of them *bona fide* bidders, but all puffers and by-bidders. In bidding in the morning on those several pieces, the highest bids were none of them made by this respondent or his agent, but the highest bids were all made by puffers, and there were several bids above this respondent's highest bids on each piece. That the persons doing this fraudulent bidding were acting for and at the suggestion and request of said Louis Woodmansee. The sale was adjourned from noon to 2 o'clock P. M. The said plaintiff, after the adjournment and before the hour had arrived to which the sale was adjourned, discovered that puffing and illegal bidding had been going on during the morning sale at the instigation of the said Louis Woodmansee. At two o'clock the sale began again, this respondent not being present, but his son and agent being there present had a conversation with the plaintiff, in which plaintiff said in substance, upon an enquiry being made by said agent, that he was going to offer the lots *as a whole* to see in which way they would produce the most money, together or separately, giving the impression that the bids in the morning were *bona fide*, whereas in truth and in fact the plaintiff at that time knew that such was not the fact, and yet failed to disclose it to this respondent's said agent or other persons then present at the sale, and who said agent and others knew were also present at the morning sale and at the time of adjournment of said morning sale. Respondent's said agent was present all day while said property was being cried. The property was cried as a whole, and fraudulent puffing and illegal bids were made upon it as whole during the afternoon by the same puffers, or some of them that had run the property up in the morning, and the property was run up till it had reached the sum of twenty-two thousand seven hundred dollars, when it was knocked off to this respondent at a price far in advance of what he would have bid and what he had previously instructed his agent to bid. Respondent's agent was induced to bid to this amount by this illegal bidding. This respondent did not desire the whole of this property, but as he was the owner of the property on Main street lying directly west of the forty-feet of lot 119 he desired to purchase said forty-four feet so as to give him an outlet to Market street, and was willing, there-

fore, to give a price for the same more than its actual value. Neither this respondent nor his agent had any knowledge of any fraudulent or puffing bidding until several days after the memorandum of sale was signed, and upon learning of such puffing and fraudulent bidding, he promptly declined to complete said sale and repudiated the same.    This respondent says that by virtue of the will of said Samuel Lewis before and at the time of said alleged sale Susannah Lewis was the owner in fee of an undivided one-half interest in the south twenty-two feet of lot 119, which twenty-two feet of said lot were not covered and never had been by the two deeds of trust to the plaintiff and by the two deeds of trust to said Forbes, and that said Louis Woodmansee was then the owner of the other undivided one-half thereof. Respondent further says that said sale, by reason of illegal bidding thereat, was fraudulent and void as to him, and that he will be grossly defrauded if compelled to take said lots at said bid of twenty-two thousand seven hundred dollars and specifically perform said memorandum or contract of sale."

On the 7th day of April, 1882, the court entered the following order:

"This day came the defendant, Henry K. List, and moved the court to permit him to file a supplemental answer in this cause, which he tendered, and said defendant filed the affidavit of Henry K. List, which is read, and the court, on motion of the complainant, inspected and read the record of the bill and other proceedings in the chancery cause pending in this court, wherein George Brown, Daniel Steenrod and others are complainants and Louis Woodmansee and others are defendants, which cause is referred to in the bill in this cause and in "Exhibit C" thereof, and the complainant objected to the filing of said supplemental answer.

"On consideration whereof the court, being of opinion that it is proper to permit such answer to be filed, doth overrule the said objection, and the said supplemental answer is accordingly now filed."

In the supplemental answer referred to in this order is the following:

"This respondent has, since the filing of his former answer, discovered that he was mistaken in the matters afore-

said, except that Louis Woodmansee is the son-in-law of said Susannah Lewis, a member of her family, and has charge of her business affairs. Said respondent has since discovered, and now charges the fact to be, that the notes secured by the two deeds of trust in which the complainant was trustee, and by the said two deeds of trust in which Hannibal Forbes was trustee had long before the execution and delivery of the instrument in writing, ot which 'Exhibit 1' of his former answer is a copy, been fully and entirely paid off and satisfied, to-wit, on the ———— day of December, 1878, and that at the time of the execution and delivery of said instrument in writing to said Susannah Lewis the said William Bailey had no lien whatever upon any of the property mentioned in said deeds ot trust to the complainant and to Hannibal Forbes, respectively, or any of them, the notes secured by said deeds of trust having been paid off and satisfied as aforesaid, to-wit, during December, 1878, and that by said instrument in writing no lien or claim of any kind whatever against the property named in said deeds of trust was transferred or assigned to said Susannah Lewis.

"Respondent further says that he has discovered since filing his former answer, and now charges the fact to be, that from and after January 1, 1879, the money claimed by said Bailey to be due by said deeds of trust to the complainant and Hannibal Forbes, trustees, was wholly and entirely usurious interest claimed by said Bailey upon the indebtedness evidenced by the notes described in said deeds of trust, the true amount of principal money evidenced by said notes with the legal interest thereon having been wholly and entirely paid to said Bailey before the last mentioned date."

The affidavit was that the new matter stated in this supplemental answer had been discovered since the filing of the original answer.

The plaintiff replied generally to these answers and the bill was taken for confessed as to all the other defendants. Numerous depositions for the plaintiff and for the defendants were taken, and the following decree entered on April 8, 1882:

"This cause came on to be heard this 8th day of April, 1882, upon the bill of complaint and the exhibits thereof, the

process of summons duly served on all the defendants, the answer of the defendant, Henry K. List, and the exhibits thereof, the general replication of the complainant to said answer, the supplemental answer of said defendant, List, and the complainant's general replication thereto now filed, the depositions on complainant's behalf of the witnesses Susannah Lewis, Hattie Woodmansee, George R. Tingle, Daniel Schambra, John Wagner and John Bodley duly taken, certified and filed, the papers returned with the depositions of said four first named witnesses, marked respectively complainant's exhibits 1, 2, 3 and 4, which papers are agreed by the parties to be copies of the two deeds of trust to H. Forbes, trustee, mentioned as such in the exhibit 1 of defendant List's answer and the pleadings and testimony in the cause, and of partial releases of said deeds of trust, the depositions on behalf of defendant, List, of the witnesses A. L. List, D. C. List jr., Henry K. List, Daniel Peck, H. Forbes, S. J. Boyd, Lewis Jones, M. Loftus, Peter Erb, Daniel Steenrod, George Brown, Samuel B. McColloch, O. Russell Wood, John A. Armstrong, W. H. Haller, T. H. Logan, M. Edwards and R. H. Cochran, duly taken, certified and filed, the exhibits filed with the depositions of each party, the complainant waiving all his objections noted on defendant's depositions except so far as they go to the relevancy and competency of the evidence, the papers heretofore read and the orders formerly made herein, certain original papers, copies of which are filed with the depositions, which original papers are now produced and identified by the endorsement of the clerk of this date, the said bill being taken for confessed as to all the defendants except Henry K. List, they having failed to appear and plead, answer or demur to said bill, and this cause was argued by counsel and submitted to the court, which takes the same under consideration."

Of the large number of depositions taken in this cause I deem it necessary according to the views I take of this case to state only the substance of what was proven bearing upon the question, whether there was or was not puffing at the sale made by Daniel Peck, trustee, which is sought to be enforced by this bill.

George R. Tingle, a former sheriff of Ohio county, witness

for the plaintiff, deposed as follows: "I was asked by Louis Woodmansee to bid for them on the Grant House property. He told me Susannah Lewis, his mother-in-law, had a deed of trust on it, sufficient to enable her to purchase lot No. 40 and lot No. 200. During the adjournment hour they talked the matter over and reported to me, that they had concluded to try and buy the whole thing, if it did not go too high. * * * * I considered I was bidding for Louis Woodmansee, the family combined, the way he talked to me. When Mr. Woodmansee spoke of the matter he always used the word 'we.' * * * I understood if the property was knocked down to me Mrs. Lewis was to take the property." He deposed that he had been told to bid two hundred dollars a front foot for the property before the sale; but while the sale was going on in the morning he was told by Louis Woodmansee to bid two hundred and twenty-five dollars a front foot, which he did. He was the highest bidder in the morning for lots 40 and 200. "During the adjournment for dinner they talked the matter over and reported to me, that they had concluded to try and buy the whole thing, if it did not go too high. Authorized me to go as high as twenty-five thousand dollars for the whole but I persuaded him to let it go at twenty-three thousand dollars declining to bid higher. I waited a while on him and he made up his mind and took this advice."

Another witness for plaintiff proved that on the first sale day Henry K. List told him (the witness) that he would not like the lot in rear of his house on Main street to be bought up to put a stable on it. He did not want a stable there. Directly after the whole property was knocked down to him. Mr. Henry K. List told him (witness) that if he wanted that part of lot No. 119 which fronted twenty-two feet on Market street, he could buy it, when the matters were all straightened up.

It was proven that when the Grant Hotel was standing Henry K. List and two others had valued the entire property including the furniture at seventy-five thousand dollars. He did this at the instance of Louis Woodmansee who wanted to borrow money by giving a lien upon it.

John Bodley testified that on the day of the first sale,

March 14, he saw one Peter Erb there, who told him he wanted to buy a piece of property in rear of the Grant House. It would be a nice place for a stable. "I told him you don't want that stable. You can make more by going to Henry K. List and getting him to give you one hundred dollars. I said this of my own accord, wasn't told to do it by List." Peter Erb said afterwards to this witness, that he did not mean to have anything more to do with it; he did not want to be bidding against his neighbors.

Peter Erb himself testified, that he kept a livery stable. He says: "Mr. Louis Woodmansee wanted me to come up to the court-house and do him a favor. He asked me if I wanted to buy property. I told him no, I had no money. He then said the Grant House property was going to be sold and certain parties were going to buy, and he would like to have it run up to a certain amount of money, and asked me to come up and run it up or help to run it up and he would pay me for my trouble. He wanted me to run up the lot back of Henry K. List's house on Main street and if it was knocked down to me the understanding was that Mr. Woodmansee would take it off my hands." He says he did not want to buy any property and had no idea of doing so.

Henry K. List testified: "I saw Erb between the 14th and 21st of May, 1881, and asked him, whether he wanted to buy that forty-four feet in rear of the Kramer house on Main street, which belonged to me. He said he did, that he wanted to put a livery stable there. He said he thought it was a good place. He said he knew I owned the property, the Kramer house, in front of this lot. I told him it was natural I should want this property, and I expected to pay for it a pretty high price. Of course I don't want to prevent you from bidding for it, because you have a perfect right to do so, but I want an outlet to my property some way—a few feet of ground, even if you should buy it—but I said it would not be any too large for me as it was. After some time he said he believed he would not bid. I then told him I had a piece of ground on Market street, which I thought was a better place for a livery stable and I would sell it to him and give him any time he needed to pay for it,

but I told him I had no desire to keep him from bidding on this forty-four feet in rear of my house."

Michael Loftus also engaged in the livery business testified: "A few days before the sale Louis Woodmansee saw me and wanted me to look at this forty-four foot lot in rear of the Kramer house and see if I would not like to buy it as a location for a livery stable. I told him I knew this lot and did not want it; he asked me to come up and bid for it—said it would be a great accommodation to him. I told him I would, if I could spare the time. I was to bid for Mrs. Susannah Lewis. Don't remember the amount I was told to bid. I was to bid up to a certain price on the lot in rear of the Kramer house. I was told Henry K. List wanted it, and that he would not want it purchased for a livery stable. I know Jeff. Bowers of Martin's Ferry. He is a livery stable man. The piece he wanted me to bid on for Susannah Lewis was forty-four feet wide. Louis Woodmansee spoke of his fear that the property would be sacrificed, and said Mrs. Susannah Lewis was able to take it if it was knocked down to me, as she had a lien upon it."

James A. Armstrong testified that Louis Woodmansee asked him to bid on this Grant House property for Mrs. Susannah Lewis; he told him he would, but he afterwards concluded he would not; thought if it was knocked off to him it might be thrown on his hands and he did not want it. This conversation was probably two months before the sale. Thought that if he bid he might be considered a *bona fide* bidder, and so determined not to bid on it. It would save him trouble not to bid and may be other people too; did not attend the sale.

William H. Haller, the auctioneer, testified: "On May 14, 1881, the advertisement was simply read and the sale postponed a week. On the second time it was offered for sale, May 21, 1881, I first read the advertisement and offered the property in parcels, cried it in this way for about two hours till twelve o'clock. The parties who bid in the morning were George R. Tingle, D. C. List jr., a son of Henry K. List, and Jeff. Bowers, of Martin's Ferry, Ohio. I do not think that Lewis Jones was there at all. I think James W. Paxton made a bid while passing there during the day.

These three persons were the only ones who bid for the whole or any part of the property. I simply announced at twelve o'clock an adjournment of the sale till two o'clock, nothing more. And when they met I simply announced we would offer the Grant House property as a whole. Nothing was said about the morning bids either when I opened the sale in the afternoon or at any time afterwards. I supposed that the bids in the morning were *bona fide.* I knew nothing to the contrary. It was knocked down by me at a less price in the afternoon than was bid for the property in the morning because I was told to knock it down by the trustee, Daniel Peck. I never knock property down till told to do so by the person, for whom I am making the sale. I did tell Lewis Woodmansee once, that I was under the impression, that Samuel J. Boyd had made a bid. It is difficult often at sales for outside parties to find out, who is bidding. Bidders seem generally not to want it known, that they are bidding. When I first offered the property I announced that I would first offer it in parcels and then as a whole."

Daniel Peck, the trustee, and plaintiff, states that on the 21st of May, 1881, the twenty-two feet on the south side of lot No. 119 was offered for sale, and that the highest bid for it was one thousand two hundred and fifty-four dollars. Then the fourty-four feet, the remainder of that lot, in rear of the Kramer house was offered for sale, that was bid up to two thousand nine hundred and forty-eight dollars by Jeff. Bowers, who was the highest bidder. Henry K. List bid on that piece of property, but not quite that high. Lot No. 120 was then offered, and bid up to six thousand seven hundred dollars by George R. Tingle. Then lot No. 40 at the corner of Main and Tenth streets, was offered, and George R. Tingle bid for it two hundred and twenty-five dollars per front foot, making its price fifteen thousand and seventy-five dollars. All the bids amounted to twenty-five thousand nine hundred and seventy-seven dollars. By mistake I stated at the time, that they amounted to twenty-five thousand nine hundred and ninety-nine. Henry K. List was there. Adjourned the sale till 2 o'clock P. M. The property was then offered all in one body. I thought it probable, that Samuel J. Boyd, who was there, had come

there to bid. But I did not see him bid. Saw the sons of Henry K. List bidding; saw no one else. Tried to find out who was bidding against them, but could not. Did not know till the property had been knocked off, that it was knocked off to Henry K. List at twenty-two thousand seven hundred dollars, and his son, Daniel C. List, as his agent, signed the memorandum of the sale, which Mr. D. Peck drew up. The father, Henry K. List, told him that evening, that he was going to Philadelphia, but his boys would fix up the matter. After the return of Henry K. List the trustee, Peck, tendered him the papers named in bill, but he said he was not satisfied with the sale and could not take the papers, or have anything to do with them. He said he had been imposed upon in the bidding, and that the sale had been puffed; that he had been badly treated, and would have nothing more to do with it. This was the only objection he made to the papers. This suit was instituted at the instance of Louis Woodmansee. D. Peck, the plaintiff, required a bond to be executed by Mrs. Susannah Lewis and Louis Woodmansee indemnifying him against costs, before he would allow his name to be used as plaintiff. Jeff. Bowers bid on the forty-four feet front of lot No. 119, also Henry K. List and George R. Tingle bid on the lots on Tenth street. Bid them up very quietly; I heard him bidding in the morning. He knows of no other bidders than these three.

I will give the statement of Daniel Peck, the trustee, in his own language in reference to what he found out before the sale was over in regard to the bidding of George R. Tingle at this sale:

Q. After the morning adjournment, what, if anything, did you discover relative to Mr. Tingle's bidding in the morning, and what took place about this bid?

A. Well, he had bid, and the property went up so much more than I expected it would—that they were willing to take twenty-five thousand dollars, I understood—that I suggested to Mr. Woodmansee that the property had gone up as high as it could possibly go, and we would not want much more bidding about it. He then told me that Tingle's bid he was not bound to take, for, I think he said, he was bid-

ding for us, and that his bid would not stand. I don't know whether he said for us, certainly, or for me, but he said, probably, for us. But, in any event, I knew, if he was bidding, what he meant by us; I suppose it was himself and mother-in-law; but I had not heard anything about any understanding at that time that she was going to have a bidder there at all, never had heard of it, and did not approve of that thing as it was then. But if I had known all the circumstances as I have seen since the testimony, I might have thought a little different about it than what I did then.

Q. What did you say to him when you found this out— when he told you this?

A. Well, I don't know that it is of much account what I said to him, but I suppose I said to him that if that bid was not going to stand that it was wrong, that he should not have had a bidder there that could not be held for the bids— scolded him a little, I believe, I think so, for having a bidder there who who was not bound to stand by his bidding. I did not know then that there had been any understanding between him and his mother-in-law, or Tingle, or anybody else, that anybody should bid for them.

Q. Had you any information when the bids were received there, and before the adjournment, that the bid was not made in good faith?

A. No, I had no information of that until after the adjournment was made.

Q. Did not you have a conversation with Mr. Woodmansee and Mr. Hubbard, or were not you present at a conversation between Mr. Hubbard, the attorney of Mr. Woodmansee, Mr. Woodmansee and yourself, during that noon adjournment?

A. Yes, we were together.

Q. What was said in that?

A. I can't say what was said. I disapproved of his having a bidder there in that way. Mr. Hubbard was present during part of the time. I talked to him. I think, after I had talked to him I had Mr. Hubbard brought there, and we had a little talk about it; but I don't remember what Mr. Hubbard said, at all, only I had a kind of recollection that he

agreed with me that it was not right that he should have a bidder that was not to be bound by his bid.

Q. What, if anything, was said at that time about bidding in the afternoon?

A. Well, I don't know. I decided myself, whether I announced it or not, that I would offer the property irrespective of any bidding that had been done in the morning, as a whole, and see what that would come to.

Q. Anything said in relation to Mr. Tingle's bidding in the afternoon?

A. No, there was not a word said about it. I did not know that he was to bid, nor did I know that he had bid until after it was struck off some time.

Q. State what proclamation or notice was given to the parties assembled at this sale as to the character of the bids in the morning?

A. There was not anything said about it in my proclamation or statement to the bidders that I know of. I had announced that the whole of it would be offered for sale together. Perhaps in the morning it was announced that we would sell it there in parcels, or in the whole, as it would sell best. I think we did.

Q. What notice, if any, was given that the bids in the morning were off, or that they were not *bona fide*, during the sale at any time?

A. There was not anything said about it at all, then. But it was offered as a whole in the afternoon.

Q. Who did you see bid on the property as a whole in the afternoon?

A. I saw the two young Lists bidding, and I did not see anybody else bidding, nor did I know who else did bid. There were bids made, but it was done by some kind of signs that I did not understand, and I made some little effort and went into the clerk's office to find out and could not find out—did not find out.

Q. Where was the clerk's office?

A. It was at my back, there where I was. I thought that it, the bid, came out of the clerk's office, and I went in there to George Hook, the county clerk, and he said there was nobody bidding in there.

And on cross-examination testified in answer to questions as follows:

Q. At the time of the conversation with Mr. Woodmansee at which he told you that Mr. Tingle had been bidding for "me" or "us," did not he tell you after you first began to "scold him," to use your expression, that he was actually bidding for mother Lewis?

A. I have no recollection of his giving any intimation of that character to me. I was under the impression at that time that George Tingle was bidding upon his request. He did not tell me that it was on mother Lewis' account then; nor did I know that he was bidding at all in the afternoon, or that he was bidding for mother Lewis. Had I known he was bidding, I should have requested him to state who he was bidding for; if he was not bidding for himself, I should have required him to state for whom he was bidding, or he should be charged with the bid personally.

Q. Did not Mr. Woodmansee tell you also at that time it was all right, Tingle bidding; that he had consulted his attorney about the matter, and had been advised that the bidding had been legal?

A. He told me that at some time, but not at that time. He did not tell me anything about it while Tingle was bidding. I saw Tingle bid, and supposed he was bidding for himself, had no other idea all the while, until after the sale had been adjourned at noon.

Q. Then at the time that you scolded Mr. Woodmansee you supposed that Tingle was merely puffing, and did not know that he was representing Mrs. Lewis and that she had made arrangements to take the property if it should be knocked down to her, and had determined to take it herself rather than let it be sold at what she considered an inadequate price?

A. I don't know any of those matters at all. I did not know that Tingle was bidding for Mrs. Lewis, and had not the least idea of it. I did think he was puffing, if you must have the truth.

Q. Were not you also under this impression at the time of your conversation with Mr. Clarke, referred to in your direct examination?

A. I had more than one conversation with Mr. Clarke. I wish you would call my attention to the particular one you mean.

Q. I mean the one referred to by Mr. Caldwell in his question to you on the direct examination. I believe you located it in Mr. Clarke's office.

A. Perhaps all the conversations I had with him were in his office, I presume. I did not know for some time after the sale that there had been any arrangement between Mrs. Lewis and Mr. Tingle, bidding for her; it was a considerable time after that until I understood that. I then only understood what Mr. Woodmansee told me, that she did make arrangements to make the first payment on this bid rather than to have it sacrificed, that she would have taken it if it had been struck off to her. I did not know that until a considerable time after the sale was made.

Q. Then you probably did not know it when you talked to Mr. Clarke in the way you did?

A. I never told Mr. Clarke that Henry List could set aside this bid. I hope you will all give me credit that I would not give my case away square. Probably I told him the circumstances, but I never told him nor anybody else that Henry K. List could set this aside. I don't know how it will be.

Q. Did not you afterwards, as a fact, refuse, when Ambrose List called on you and made, in effect, that request, to do it, and tell him to wait until his father came back?

A. I don't remember particularly about that. But I did not consider that I had any control over that sale. I was merely trustee. It was not my property that I was selling, and I did not suppose I had any power to set aside the sale at all. But when it was going on, if I had known that it was being puffed in any way, I should not have permitted any such thing to be done, because it was wrong. But I supposed in the morning that Mr. Tingle was bidding for himself. But at the adjournment at noon Mr. Woodmansee said he was not bound to take that bid, and told him he had no business to go and give a bid at all. He said he was not bound to take it, that he was bidding for "us." That is all he told me about it then. Then it was that I scolded him for permitting any such thing, or having it done at all.

Q. Did you have any such announcement made in the afternoon—at the beginning of the sale of the property as a whole—as that the property must bring more as a whole than it had been bid up to in the morning, or there would be no sale?

A. No, sir, I had no such announcement as that made, for I did not expect it to be bid up that much.

Q. But you simply had announced that the property would now be sold as a whole or put up as a whole?

A. I had that announced, that it would be put up as a whole, and probably announced that it could not be sold under nineteen thousand dollars.

Q. That was for no other reason than because the agreement entered into between these parties contemplated the deposit of that amount in bank?

A. Yes."

D. C. List, a son of Henry K. List, testified that the crier on the morning of the 21st of May, when the sale commenced, announced that the property would not be sold unless the aggregate of the bids for the parcels amounted to nineteen thousand dollars, there being a reservation of two peanut stands and some boards in a stable, which Mr. Woodmansee afterwards agreed might go in the sale. His recollection is, that the aggregate amount of the bids for the different parcels was twenty-five thousand nine hundred and nine-nine dollars. He thinks that Jeff. Bowers' bid was the highest on the forty-four feet front of lot No. 119 in rear of the Kramer house. He bid on it for his father. On lot No. 40 on the corner of Main and Tenth streets, George R. Tingle made the first bid. The witness made one or two bids on it. George R. Tingle's was the highest bid, two hundred and twenty-five dollars a front foot. The witness was bidding for his father, who wanted particularly the part of lot No. 119 in rear of the Kramer house, which he owned. It was forty-four feet in front on Market street. His recollection is, that at noon it was stated that the property would be offered as a whole after dinner, at two o'clock; did not know who bid on the property in the afternoon, besides himself. He asked several persons, but they could not tell; asked S. J. Boyd and the crier, and Mr. Peck. They all

said they did not know, but the crier, who said one bid came out of the recorder's office, but that is all he said; would not tell. The property was started at twenty thousand dollars in the afternoon; his father was not there. It was at twenty-one thousand dollars when his brother, A. S. List, came to the place of sale. He stayed probably a half hour. He started the property at twenty thousand dollars calling it out; afterwards he nodded to the crier. Everybody knew he was bidding; there was no concealment of it. This was the only bid he made in the afternoon. Mr. Peck told him in the afternoon, that he had tried to find out who was bidding, but did not know. His brother left, and went down to the store to see their father. He kept on bidding; when he came back he had bid twenty-two thousand seven hundred dollars. He had been instructed to bid twenty thousand dollars. The other bids he made more to hurry up the sale than anything else; had no idea the property would be knocked down till it reached the aggregate bids made in the morning, twenty-six thousand dollars. He then states a conversation, which he had with George R. Tingle after he, witness, bid twenty-two thousand seven hundred dollars:

"I was standing on this side of the street, opposite the court-house, talking to my brother. He came over and called me to one side, and he says, 'Now, your bid and mine are the only bona fide bids on this property. I am authorized to bid twenty-three thousand dollars for this property, but I would rather that your father would have the property; I think your father would improve it, and I would like to see him get it;' and wanted to know if he made another bid would we bid twenty-three thousand dollars. I told him then to make his bid and we would see what we would do. The first part of this converstion Mr. Tingle and I had alone. I called my brother then and he repeated almost the same thing to him. He in that conversation said, I think, that he had been talking to James W. Paxton, and would go and see him again. He said further—let's see; he said that he would go and see Mr. S. J. Boyd and would come back, but I never saw him after that; I think he said also that he had been talking with Mr. Woodmansee, who did not want to let the property go at twenty-three thousand dollars; did

not know what would be done with it after that.   That was
about all he said about it.   He got on his horse then and
went away."

Between a quarter and a half an hour afterwards the
property was knocked down at his bid of twenty-two thou-
sand seven hundred dollars.   He signed the memorandum
of the sale.   He thought he could do nothing else, though
when he made the bid he did not expect to get the property.
He had no suspicion that the bids made in the morning were
not all *bona fide.*   Nothing was said about them.   While
his father was in Philadelphia, after the sale he had talk
with Louis Woodmansee.   He said he saw no reason why
his father should not take the property.   He, witness, inti-
mated that he had bid on the property.   He said he had not,
but that Mr. Tingle had bid for Susannah Lewis, whom he
considered a good bidder.   Witness told him he did not
think so, that he understood Mr. Peck had said, that if he
had known that Mr. Tingle had bid in the afternoon he
would have declared the sale off or something to that purpose.
He said, "Peck's a damned fool."   This was on June 6, 1881.
Before the property was knocked down to him not a word
was said about his father's willingness to pay in cash.   It
was several days after the sale before he learned there was
anything wrong about it, but it was before his father went
to Philadelphia.   In the morning he was instructed by his
father to bid only on the forty-four feet in rear of the Kramer
house.   The bids which he made on the sixty-six feet, at the
corner of Main and Tenth streets, he did of his own accord
for his father without instructions from him, being satisfied
he would approve what he did to the extent of the bids he
made.   When his brother came back in the afternoon he
told him his father said, that he could bid twenty-two thou-
sand dollars on the property, but he had already bid the
twenty-two thousand seven hundred dollars.   He spoke to
Mr. Hubbard, the counsel of Louis Woodmansee, during
the afternoon and asked him if he knew whether the prop-
erty was going to be sold as a whole or in parcels?   Mr.
Hubbard told him he knew nothing about it, he had nothing
to do with it.   Witness asked him what he thought he had
better do?   He left me saying, "Bid if you want to."   The

property was then being bid at twenty-two thousand dollars. He considered George R. Tingle's bids in the morning as made for himself. He was able to purchase the property. When George R. Tingle said in the afternoon, that bids had been made that were not *bona fide*, the witness felt he had bid too much, but did not think he could back out of his bid. In the afternoon when witness made a bid, after awhile the auctioneer would cry a hundred dollars more, but witness did not see Tingle at all, did not know he was around anywhere.

A. S. List, his brother, confirms him in his statement, so far as he speaks of it, what took place in his presence, and especially of what George R. Tingle said after his brother had made the bid of twenty-two thousand seven hundred dollars. He states that after the sale, while his father was in Philadelphia, Mr. Peck told him, "that he had no business having Mr. Tingle there bidding for him, or anybody; that it was illegal, and he told him he did not think he could make us take the property. He also told me, that had he known that Mr. Tingle was a bidder in the afternoon he would not have knocked the property down to us." It was during the week after the sale that he said this. Louis Woodmansee told him, that S. J. Boyd was a bidder, that George R. Tingle was bidding for him in the morning, but he did not know who he was bidding for in the afternoon; but afterwards in the same conversation he said he supposed he was bidding for him. When he went down to see his father during the afternoon of the sale, he told him his brother had bid twenty-two thousand five hundred dollars on the property. I told him I did not think that there was any probability of it being knocked down to him at that price, as in parcels it had been bid up to nearly twenty-six thousand dollars in the morning. He sanctioned my brother's bid at the time. I advised my brother not to bid any more than this twenty-two thousand five hundred dollars without our father's sanction. When I came back I found that he had made another bid, twenty-two thousand seven hundred dollars. I told him I was sorry he had done it, but he said he supposed he would not get it, at any rate not on that bid. In the morning we all thought Mr. Tingle was bidding for

himself. He had obtained some property on the Island and we supposed he was bidding to make another investment.

Henry K. List testified, that he wanted to buy the forty-four feet in the rear of the Kramer house as he owned that property; that he was at the sale for about one hour on the morning of the 21st of May. I asked Mr. Peck, the trustee, to have announced publicly, that a perfect title would be made to the property or to any portion of it which should be knocked down, and this he did. Was considerably surprised in the evening when informed, that the property had been knocked down to me at twenty-two thousand seven hundred dollars as it was so much less than had been offered in the morning. He had been of the impression that he had been informed, that his bid was the highest on the two parcels of No. 119, but supposes he is mistaken in this. He went to Philadelphia on the 25th of May, 1881, four days after the sale. On Monday, the second day after the sale, Daniel Peck came into his office, and he said, "Mr. Peck, if Mr. Boyd bid upon the property I presume I am in for it and I will pay for it in cash, provided the title and all the agreements connected with the title are carried out." While in Philadelphia he met Dr. Logan, of Wheeling, who told him Mr. Woodmansee had stated to him, that Mr. Paxton had been a bidder on the property, and he heard by letters from his son that such statements had been made of others bidding on the property, whom I had reason to believe had not bid, and this confirmed his views that there had been puffing. Went to see Susannah Lewis after his return from Philadelphia, only because she earnestly urged him to do so. I told her I would rather throw my money in the river than feel, that I had been imposed upon by parties whom I thought ought to be friendly to me. I said I would give my check for the nineteen thousand dollars to the proper parties to receive the money, when I was satisfied with the title.

My first suspicion that there had been puffing was on Monday after the sale, May 23, 1881, when Mr. Peck said he believed, that Mr. Boyd had bid upon the property, when I felt sure he had not. My next suspicion arose from Woodmansee's efforts to make the community believe, that there had been good bidders on the property, such as Mr. Paxton's

bid, Lewis Jones's and Mr. Boyd's bids, when I was satisfied that none of them bid. He further testified, that on the 19th of May, 1881, two days before the sale, he received a letter purporting to come from New York enclosing a plat of the Grant House property, which was sent with the letter I had written valuing this property and the furniture when the house was standing before it was burned, and which was written at the instance of Lewis & Woodmansee, when they wanted to borrow money. This letter, received two days before the sale, purported to be written by one Mason, in New York, asking him (List) about the property, and intimating that he would probably be willing to pay for this ground a reasonable price, naming he thinks three hundred and fifty dollars a front foot for the entire property, which would have been twenty-three thousand one hundred dollars for lots Nos. 40 and 120. He telegraphed him in reply, that the property could no doubt be bought for a great deal less money. The reply of the telegraphic operator was "no such party at the address or can be found in New York." He at once suspected that something was wrong. He had the telegram recalled; thought that in replying to this letter he was doing a favor in endeavoring to bring a bidder here. He suspected the parties here of sending that letter to New York setting a price they were willing to bid for the front foot through, endeavoring thus to induce him to bid on the property a good price. The letter stated, that he Mason wanted the property for hotel purposes. The application for the loan, made some years before, was also enclosed in this letter. He believed, that Louis Woodmansee had this letter mailed to him. He suspects, that the papers Louis Woodmansee mailed to New York some years ago were returned to him, when he failed to make the loan, and he sent these notes with this letter purporting to be written by Mason of New York. The letter to him was mailed in Philadelphia, though purporting to come from New York. This however is a mere suspicion. He has never heard of Mason. He has no knowledge that the papers sent to New York, some years since, were returned to Louis Woodmansee.

Samuel J. Boyd was at the sale, did not come there to bid and did not bid, and certainly did not intend to make the

impression he was a bidder; he was talking most of the time
to the defendant George Brown.  Lewis Jones testifies he
never bid at this sale, was not present at the sale at all.
Michael Edwards testified that on the day this property was
sold, shortly after the sale was completed, Louis Woodman-
see told him that it had been sold to Henry K. List for
twenty-two thousand seven hundred dollars, and that Lewis
Jones had run it up on him, and that James.M. Paxton and
Samuel Boyd had been talking about buying the property.
He said the price was low.

, Dr. Logan testified, that he had a conversation with Louis
Woodmansee a week or two after the sale; he said George
R. Tingle had gone to Mr. Paxton at the sale and asked him
to increase his bid on the property, but Paxton declined to
bid more.  Jeff. Bowers's deposition was not taken.  Mrs.
Susannah Lewis, the mother-in-law of Louis Woodmansee,
he having married her only daughter, testified that he was
the agent to transact all her business.  She says she made an
arrangement with him to have a bidder for her at the sale.
She wished him to speak to Mr. Armstrong, who was going
away on business; then she told him to see Mr. Tingle, a
neighbor and friend.  She had she says a mortgage on the
property which she got from Mr. Bailey.  She says the
property was not bid off in the forenoon.  We talked the
matter over and concluded to let it go at the highest bid.
In the afternoon Louis Woodmansee told her, that the prop-
erty had been bid up to twenty-two thousand seven hundred
dollars.  We talked the matter over and thought we had
better take that.  I had heard what the morning bid was.
We wanted the money, and Mr. List said he would pay the
money down.  It was to be payments in the forenoon, and
in the afternoon it was cash down, that is the way she
understood it.  Her examination shows, that she had no
business capacity and depended entirely on Louis Wood-
mansee, her son-in-law, in business matters.  She was sixty-
six years old.  Mrs. Hattie Woodmansee, the wife of the
defendant, Louis Woodmansee, testifies in reference to the
conversation had with Henry K. List some weeks after the
sale.  I regard it as unimportant especially as it differs
very greatly from Henry K. List's statement of this conver-

sation. They were then in antagonism, Henry K. List having made up his mind that he would not take the property at his bid, and doubtless nothing was said in this conversation by the parties on either side prejudicial to their respective rights and claims, and any statement of this conversation, which had any indication of this sort, would be regarded as a mis-statement of it. Nothing however is even said to have occurred, which would amount to much even had it occurred as stated. Mrs. Hattie Woodmansee was objected to as an incompetent witness, she being the wife of the defendant, Lewis Woodmansee.

There is a large amount of testimony with reference to whether or not Mrs. Susannah Woodmansee had, as a creditor, any lien on any part of this property as well as on other questions put at issue by the bill and answers, but as I have concluded that this cause can be decided upon the main question of controversy whether or not the sale of the 21st of May, 1881, was so vitiated by puffing, that Henry K. List is not bound to take the property at his bid, I have concluded to state fully the testimony bearing on that point, and omit the balance of the testimony as immaterial to the determination of this cause according to my view. The evidence on this point is scattered through a record of three hundred and thirty-five printed pages, and the record has been printed in violation of law without any table of contents, and laboring under these disadvantages in stating the case it has doubtless been done in anything but a clear and distinct manner, but I believe every material fact has been stated.

On the 30th day of June, 1882, the municipal court of Wheeling rendered a final decree in this cause dismissing the bill. The decree is as follows:

"This cause, which was heard, argued by counsel, and submitted on the 8th day of April, 1882, and which the court then took under consideration, having been maturely considered, and the court being advised of its decree herein, on the 30th day of June, 1882, doth adjudge, order and decree that the bill of complaint of the plaintiff be and the same is hereby dismissed, and that the said Daniel Peck do pay to the said defendant, Henry K. List, his costs by him about his defense in this cause expended, excepting fifty-five dol-

lars of the costs of depositions taken in this cause on behalf of the said defendant, Henry K. List."

From this decree Daniel Peck, trustee, obtained an appeal and *supersedeas.*

*W. P. Hubbard* and *Cracraft & Ferguson* for appellant.

*R. G. Barr*, *A. J. Clarke* and *Caldwell & Caldwell* for appellees.

GREEN, JUDGE:

The principal question of controversy in this case is: Did George R. Tingle in bidding at the auction-sale made by the complainant, Daniel Peck, on the afternoon of the 21st of May, 1881, occupy substantially the position of a puffer, and if so can Henry K. List, the defendant, for this reason repudiate his purchase? A puffer in the strictest meaning of the word is a person who without having any intention to purchase is employed by the vendor at an auction to raise the price by fictitious bids, thereby increasing competition among the bidders, while he himself is secured from risk by a secret understanding with the vendor, that he shall not be bound by his bids. I will first enquire what is the effect upon the sale, as settled by the common-law courts of England, of the employment by a vendor of a puffer and of his bidding at an auction sale. The leading English case on this subject is *Bexwell* v. *Christie*, 1 Cow. 395. In that case it was decided that an action does not lie against an auctioneer for selling a horse at the highest price bid for him, contrary to the owner's express directions not to let him go under a larger sum named—otherwise, if the owner had directed the auctioneer to set the horse up at a particular price and not lower. Lord Mansfield in pronouncing the opinion of the entire court says in substance and in almost this language:

"The matter in question is in itself of small value; but in respect to the principles by which it must be governed it is a question of great importance. Since the trial I have mooted the point with many who are not lawyers upon the morality and rectitude of the transaction. The question is, whether a bidding by the owner of goods at a sale under the

condition that the highest bidder should be the purchaser is a bidding within the meaning of such conditions of sale? It is not a direction, that there should be no bidding under the price named by the owner, in that case fifteen pounds; but the direction is not to let the horse go under fifteen pounds, which implies that there might be a bidding under that sum. This is equivalent to a private bid of that sum by the owner. The question is, whether the owner can *privately* employ another person to bid for him? The basis of all dealings ought to be good faith; so more especially in these transactions, when the public are brought together upon a confidence, that the articles set up at a sale are to be disposed of to the highest bidder; which could never be the case, if the owner might privately and secretly enhance the price by a person employed for the purpose; yet tricks and practices of this kind daily increase and grow so frequent, that good men give in to the ways of the bad and are dishonest in their own defence. But such a practice was never openly avowed. An owner of goods set up for sale at an auction, never yet bid in the room for himself. If such a practice was allowed, no one would bid. It is a fraud upon the sale and upon the public. The disallowing of it is no hardship upon the owner. If he is unwilling that his goods should go at an under price, he may order them to be set up at his own price, and not lower; such a direction would be fair; or he might do as was done by Lord Ashburton, who sold a large estate by auction; he had it inserted in the conditions of sale, that he himself might bid once in the course of the sale; and he did bid once fifteen or twenty thousand pounds. Such a condition is fair, because the public are then apprised upon what terms they bid.

"The question then is, is a *private* bidding by the owner fair? If not, it is no argument to say it is a frequent custom; gaming, stock-jobbing and swindling are frequent; but the law forbids them all. Suppose there was an agreement privately with a particular person, that if he was the highest bidder, so much would be abated; frequently abatements from the price fixed by the vendor are made on a private sale and of course legitimately; sometimes ten or fifteen per cent is thus abated. But a *private* agreement of

this sort between the owner and the bidder, at a sale by auction would be a gross fraud. What is the nature of such a sale by auction? It is that the goods shall go to the highest real bidder. But there would be an end of that, if the owner might privately bid upon his own goods. There is no contract with the auctioneer. He is only an agent between the buyer and the seller. He may fairly bid for a third person, who employs him, but not for the owner. Therefore upon full consideration I am of opinion, that a bidding by the owner privately or its equivalent, a direction given to the auctioneer privately, not to let the property go under a certain sum, would be a fraud upon the sale; and consequently that this action against the auctioneer for knocking off the horse to the highest bidder below the price fixed by the owner privately cannot be maintained."

I have given the whole of the opinion of Lord Mansfield on this subject and nearly in his own language, as in my judgment neither the reasoning nor language admits of improvement. It is true that this decision and reasoning has been since disapproved by some eminent jurists, but it is obvious that in a number of decisions, which condemn the principles here laid down, the judges very good men and able jurists have, as it were in their own defence, given way and countenanced or winked at such evil practice, only because it had become so general and had for such reason received the countenance of the courts. Not unfrequently while announcing such adverse decision or views these jurists have, as it were, apologized for it because of the extent of the practice and the countenance of some courts, though at the same time they have said, that the reasoning of Lord Mansfield in this case was in their judgment sound and correct, and that it would have been wiser to adhere to it. But other able jurists have refused to yield to this pressure and have adhered to the principles laid down in this case; and many courts, which for a time yielded to this pressure, have returned to them, if not in their entirety, at least to a large extent. The English common law judges have almost universally adhered strenuously to the principles laid down in this case, which at this day, though delivered as long ago as 1776, prevail in the courts generally in England and in this country to a much

larger extent than they did fifty years ago.    We will refer to some of the many English common law cases, in which these views of Lord Mansfield have been adhered to and acted upon.

In *Howard* v. *Castle*, 6 T. R. 643, it was decided, that, if the owner of goods or an estate put up to sale at auction employ puffers to bid for him without declaring it, it is a fraud on the real bidders, and the highest bidder can not be compelled to complete the contract.    In that case Lord Kenyon says:    "The parties did not meet on equal terms; several other persons beside the defendant bid, who by so doing represented themselves as embarking on their own judgment; but it afterwards turned out, that this was false, and that it was an imposition practiced by the plaintiff on the defendant, for all these other persons were authorized by the plaintiff to bid for him.    I will not go into the general reasoning on the subject, because it is very ably stated by Lord Mansfield in *Bexwell* v. *Christie*, 1 Cow. 395.    The reasoning in that case is founded on the noblest principles of morality and justice, principles that are calculated to preserve honesty between man and man."    All the other judges concurred with Lord Kenyon Ch. J.    Grove, J., say, "nothing can be more true than the doctrine of *Bexwell* v. *Christie*, 1 Cow. 395.    If the owner of goods put up to sale at auction wishes that they shall not be sold under a particular price, he may declare so before the auction begins, or he may reserve one bidding for himself, or declare that he has appointed a particular person to bid for him; in either of these cases the parties meet on fair terms.    But the whole of this was a secret transaction unknown to the defendant and it was a fraud and imposition upon him."

In *Wheeler* v. *Collier*, 1 Moo. & M. 123 (22 Eng. Com. L. R. 266) it was decided:    "If the owner of an estate put up for sale by auction employ a person to bid for him, the sale is void, although only one such person be employed, unless it is announced at the time that there is a person bidding for the owner."    Lord Tenterden, C. J., said:    "I am clearly of opinion this sale is void in point of law.    I am not called upon to decide the case of one person only being employed to bid; here are two, and it certainly makes a material difference, whether a person wishing to purchase

sees one or two persons bidding against him. But that I may not be understood to decide that case on that ground, I will add that the strong inclination of my opinion is, that if only one person be employed to bid the sale is void; unless it is announced that there is a person bidding for the owner, the act itself is fraudulent." This was obviously implied in the case of *Bexwell* v. *Christie*; for the telling of the auctioneer by the owner privately not to let the property be sold for less than a certain price, was obviously the equivalent of privately employing a single person to make a single bid for the owner. And this Lord Mansfield in that case held rendered the sale fraudulent.

In *Crowder* v. *Austin*, 3 Bing. 368 (13 Eng. Com. L. R. 11), it was decided according to the syllabus: "The vendor of a house stationed his servant to join in the bidding at a public auction and the servant bid up to twenty-three pounds after a *bona fide* bidder had bid twelve pounds. Held that the sale could not be enforced against a subsequent bidder." The judges expressly approve the opinion of Lord Mansfield in *Bexwell* v. *Christie*, though it had then been disapproved by the Lord Chancellor in *Conolly* v. *Parsons*, 3 Ves. Jr. 625. In this case it may be noted that there was but one by-bidder; but obviously some of the judges regarded this as not making the least difference. They do not even comment upon it.

In the case of *Rex* v. *Marsh*, 3 You. & Jer. 331, it was decided, "that the employment of a puffer at a sale by auction of property seized under an execution by an agent of the crown, to whom a bidding is reserved by a condition of sale, vitiates the sale. And further the misconduct of the purchaser does not preclude him from objecting to the employment of a puffer at a sale by auction." In that case one of the conditions of the sale was "on the part of the crown, Mr. E. Driver to be at liberty to make one bidding but no more, and if the highest bidder, the sale to be void." It was argued that if this was allowed, it would be injurious to the interest of the crown, as in that case no purchaser would be found. The court refused to confirm the sale, though this bid was reserved, and though it was shown, that the purchaser had acted improperly, and that the biddings of the puffer did not exceed the value of the property.

In *Thornett* v. *Haines*, 15 Mee. & W. 367, it was decided that "when a sale by auction is advertised or stated by the auctioneer to be without reserve, the employment by a vendor of a puffer to bid for him without notice renders the sale void and entitles the purchaser to recover back his deposit from the auctioneer. The opinions in this case show, that while the judges were all disposed to hold to the decisions and opinions of Lords Mansfield, Kenyon and Tenterden, which we have before stated, yet they were anxious to avoid coming in direct conflict with the chancery decisions, which, as we shall see presently, did not in important respects conform to the opinions and decisions of these eminent common-law judges, and hence they put their decisions in that case on its being announced that the sale was "without reserve," as it was done in that particular case, which, they thought, freed it from all doubt, as even by the chancery decisions in such a case the employment of a puffer would vitiate the sale. Pollock, C. B., says: "I adopt the law as laid down by Lords Mansfield, Kenyon and Tenterden. I think however the decisions in the courts of law and equity may be reconciled. There is no distinction between a puffer bidding up to the buyer, or bidding by him at a different stage of the sale; but if there were, it would not apply to this case, as here Robinson was a puffer and bid immediately before the plaintiff. The only distinction between the cases in equity and law is this, that in the former there may be a *reserved* bidding without notice; but that does not apply to the present case when the sale was distinctly stated and understood to be *without reserve*; and it matters not whether the announcement is made by the particulars of sale, or by the auctioneer by parol." This decision accords with the decisions of Lords Mansfield, Kenyon and Tenterden before referred to, but the court has thought proper to base the decisions in part on the announcement by the auctioneer that the sale was "without reserve" because when based on that ground in part it would accord with the decisions in the chancery court with which these judges did not agree but with which they did not want unnecessarily to come in conflict.

In *Green et al.* v. *Baverstock*, 14 C. B. N. S. (108 Eng. Com. Law Rep. 204), it was decided that "upon a sale of goods by

auction, where the highest bidder is the purchaser, the secret
employment of a puffer on behalf of the vendor is a fraudu-
lent act and vitiates the transaction." It will be observed
that in this case there was no announcement that the sale
was "without reserve." But as it was a sale at auction to
the highest bidder, it was regarded by the court to be with-
out reserve. Byles, J., says, page 208: "What may be the
practice in the courts of chancery I do not profess to under-
stand; but the rule at common law, I apprehend, is plain :
At a sale by auction, when the highest bidder is to be the
purchaser, the secret employment of a puffer by a vendor is
a fraudulent act. The sale is vitiated by the fraud and void,
unless the vendee with knowledge of the fact has acted upon
it, so as to deprive himself of the right to complain. This
has been the law of England and indeed of the whole of
Europe for a very long time. It was a law of universal ap-
plication even before the Christian Era."

In the case of *Warlow* v. *Harrison*, 1 Ell. & Ell., Q. B.
(102 Eng. C. L. R.) 295, the plaintiff at an auction of a horse,
advertised by the auctioneer to be sold without reserve, bid
for the horse a certain amount; the owner by a puffer bid
higher. The plaintiff having found out that it was a puffer's
bid would bid no more, and the auctioneer knocked the
horse down to the puffer, not knowing he was a puffer. The
plaintiff tendered the amount of his own bid to the auc-
tioneer and demanded of him the horse, which he refused to
deliver to him. Thereupon the plaintiff brought a common
law action against the auctioneer. The court of exchequer
chamber decided he was not entitled to recover, because,
though the bid of the owner through the puffer was fraudu-
lent, and the auctioneer, had he known the fact, ought to
have refused the bid and knocked the horse down to the
plaintiff, yet till it was knocked down to him, he had no
right to demand the horse, and till the horse was knocked
down to the plaintiff, the auctioneer was not the plaintiff's
agent, but only the agent of the vendor, and therefore not
liable to a suit of this character, though he might have been
liable to the plaintiff on a declaration complaining, that the
auctioneer had undertaken to sell the horse without reserve
and had not done so.

In *Hopkins* v. *Tanqueray*, 15 Com. Bench (80 Eng. Com. Law) 130, (6 Scott) Crowder, J., says (p. 142): "It is a grave question whether a contract made privately with one individual, that the plaintiff would warrant the soundness of a horse, which was being sold publicly at auction, would be enforced, as all have at an auction sale a right to suppose they are bidding on equal terms."

In *Mainprice* v. *Westley*, 6 B. & S., Q. B., 118, Eng. Com. Law 427, it was questioned whether such an action would lie against an auctioneer, as was suggested would lie in *Warlow* v. *Harrison*, 1 Ell. & Ell., 309, (Eng. Com. Law R. 102).

These cases show that the common law courts of England have always maintained the views laid down by Lord Mansfield in *Bexwell* v. *Christie*, 1 Cow. 395; and they have conscientiously carried them out, not permitting them to be frittered away by nice distinctions.

But it was far otherwise in the English chancery courts. In the case of *Conolly* v. *Parsons*, reported in a note in 3 Vesey 625, 626, 627, Lord Chancellor Loughborough expressed his dissatisfaction with the opinion of Lord Mansfield, pronounced about twenty years before; and says (3 Vesey 627): "I should wish it to undergo a reconsideration; for if it is law, it will reduce everything to a Dutch auction by bidding downwards. I feel vast difficulty to compass the reasoning, that a person does not follow his own judgment, because other persons bid; that the judgment of one person is deluded and influenced by the bidding of others, when it is publicly known, that persons are employed to bid, it would be very foolish in any one to let himself be so influenced." His idea evidently was, that puffers ought to be permitted in all cases to bid, and if this was settled as the law, that then certainly no harm could result from it, as no real bidder would then be influenced by the bidding of puffers. But it seems to me, as has been frequently said by the common law judges, that the effect of authorizing by law the bidding of puffers would be to prevent bidders from attending auctions, and auction sales would practically cease. This would certainly be a public evil. Now, it seems to me that the idea, that one bidder at a public auction is not in-

fluenced by the bids of others, expressed by Lord Lough-borrough, is a very strange one. If there was truth in it, no one would ever employ puffers to attend a public auction; yet Lord Loughborough in another part of the same opinion says: "It is not doubted at any sale, except where there is an express stipulation to sell without reserve, that there is somebody for the seller. The buyer goes to the sale with this knowledge, that he shall not get the article under the price the seller thinks to be a reasonable price. There are several articles sold almost always by auction, that would not probably be sold so if the vendor was not allowed somebody to look after his interest. There are not above three or four purchasers of scarce and valuable books; they would divide them if the person selling had not some means of guarding against that."

Lord Loughborough in this opinion also says that some acts of parliament exempting from auction duty upon certain conditions sales, when the owner or his agent bought in the property, recognized the right of an owner to employ puffers. He says: "These acts of parliament go upon its being a usual thing and a fair thing for the owner to bid." But the common law courts held, that these acts of parliament did not in the least touch this question, and that they intended only to exempt from auction-duties, when the owner or his agent could legally bid, that is, when he expressly reserved the right to bid. Thus Justice Grove says in *Howard* v. *Castle*, 6 T. R. 643: "Nothing can be more wise than the doctrine laid down in the case of *Bexwell* v. *Christie*, 1 Cow. 395, which is not in the least impeached by the acts of parliament in reference to the exemption from auction-duties upon certain conditions, where the owner or his agent buys in the property." In the case, in which Lord Loughborough expressed these views, no decision was rendered, the cause being compromised by the parties.

Nothing can, it seems to me, be more mischievous in its tendencies than the views thus expressed by Lord Loughborough. They were in direct conflict with the law, which had been settled by the unanimous decision of the court some twenty years before in the case of *Bexwell* v. *Christie.* It would seem therefore impossible that it could really be

true as stated by Lord Loughborough: "It is not doubted
at any sale except, where there is an express stipulation to
sell without reserve, that there is somebody there for the sel-
ler." This is to say, that in his time all, who attended auc-
tion-sales, expected as a matter of course, that there would be
puffers there employed by the seller in direct violation or
what was then the undisputed law of the land as settled by
the courts. I do not question, that then as now the law was
violated by unscrupulous vendors occasionally, perhaps fre-
quently, but surely not universally or not so often, that those
who attended auctions expected as a matter of course, that
the law would be violated. If this had been true, it seems
to me, that the effect would have been to put an end to sales
by auction.

The arguments used by Lord Loughborough in favor of
permitting puffers at auction sales in England, when it was
not allowed in other countries, seem to me to be based on a
singular estimate of human nature. He says: "I feel vast
difficulty to compass the reasoning, that a person does not
follow his own judgment, because other persons bid." Of
course the person follows his own judgment in bidding at an
auction, but what is the basis of his judgment? It is not the
intrinsic value of the thing, for which he bids, but the
market-value. For if any one wishes to purchase anything
he knows he will have to give for it the market-value, which
may be very much greater or very much less than its intrinsic
value. How is the market-value of a thing ascertained?
Only by finding out at what price it or similar things sell.
No matter how wise a man may be, he must, when he is
ascertaining the market-value, be influenced largely nay
almost controlled by the opinion of others as to its value.
For it is their opinions, which constitute its market-value.
How could a wise or prudent man in any way ascertain the
market-value of anything with greater certainty than by
finding out what others are willing to pay for it? And do
not therefore the prices, which are bid at an auction by *bona
fide* bidders indicate in the best possible manner what is the
market-value of anything? If then a *bona fide* bidder at an
auction wishes to purchase a thing, he is of course willing to
pay its market-value, and he regards the bids of others as

one of the best evidences of what is its market-value. Will he not then be obviously influenced, no matter how sound his own judgment, to bid more than the market-value of the thing he wants, if a parcel of puffers bid it up beyond its market-value? He supposes them to be *bona fide* bidders, and therefore that their pretended bids represent truly the market-value of what he is bidding for. Is not this equivalent to a mis-statement of the facts, on which he is to base his action in bidding? For the opinions of *bona fide* bidders are the facts, on which he is to base his action; and these opinions are falsely stated to him. In its essence how does this differ from any other fraud committed by a misrepresentation of the facts, on which one is to base his action? The fundamental error in Lord Loughborough's reasoning is that he tacitly assumes, that at an auction the bids are made according to the estimate by the bidders of the intrinsic value of the thing, for which they bid. This is not so, it is their estimate of the market-value of the thing which regulates their bids. The Hudibrastic maxim that "The value of a thing is what it will bring" governs all men in their sales and purchases. If Lord Loughborough's ideas were well founded there could not by any possibility have been a South Sea bubble or a tulip mania or a *morus multicaulis* fever. In these cases the values of things were raised beyond their intrinsic value many thousand fold; and this was done by processes similar to puffing. Yet Lord Loughborough supposes that the prices of things sold at auction cannot be unduly raised by puffing. In this he antagonizes the universal opinion of mankind. Does not the simple fact, that men so often violate the law by employing puffers, demonstrate that they do unduly enhance the price of things sold at auction? The vendors do not thus violate the law as a mere matter of amusement; it is to make a profit. And it shows that the judgment of mankind is opposed to these notions of Lord Loughborough.

The courts, so far as I know, throughout the world have always based their decisions on views irreconcilable with these notions of Lord Loughborough. His views certainly have not been the basis of any decisions in England or in America. But they have nevertheless exercised a most

baleful influence on the decisions of the chancery court of England as well as on many decisions in America.

His view, that the employment of puffers is necessary to guard the seller against the sacrifice of his property, seems to me to be equally baseless. Was not the seller enabled to guard himself perfectly from sacrifice of his property at an auction sale by the rules which had been laid down in *Bexwell* v. *Christie*, 1 Cow. 395, and in *Howard* v. *Castle*, 6 T. R. 643? As Grove, J., said in this last case: "If the owner of goods put up to sale at auction wishes that they should not be sold under a particular price, he may declare so before the auction begins, or he may reserve one bidding for himself, or declare that he has appointed a particular person to bid for him." How can the seller be more perfectly guarded against a sacrifice of his property at an auction-sale than by these rules laid down by the common law courts? What is the necessity, in order to avoid a supposed or possible sacrifice, to resort to the fraudulent practice of puffing? And as to the suggestion, that there may be improper combinations of bidders and to defeat that puffers ought to be countenanced, the answer is that it may be effectually defeated by means above suggested by Grove, J., which are fair and open. And again the law itself protects the seller, where there is damping of the sale by bidders. But it seems to me very poor reasoning to say that sellers should be allowed to resort to fraudulent practices, because perchance bidders may resort to other fraudulent practices.

As showing the baleful influences of these views of Lord Loughborough I need but review the decisions of the English chancery courts on this subject.

In *Smith* v. *Clarke*, 12 Ves. 477, it was decided: "The circumstance that a person bid at an auction under the private direction of the vendor, for the purpose of preventing a sale at a sum, specified as the value, is no objection to a specific performance." The master of the rolls, Sir William Grant, says on page 483: "I do not mean to state a proposition so general as that there can be no fraud through the medium of persons employed by the vendor." Lord Loughborough in *Connally* v. *Parsons*, 3 Ves. 625, note, appears to doubt whether there can be that species of fraud; whether

in any case the purchaser can be said to be defrauded as being drawn in through eagerness of zeal and competition with others. "I do not go that length; for if the person is employed not for the defensive precaution with a view to prevent a sale at an under-value, but to screw up the price, I am not ready to say, that is such a transaction as can be justified in a court of equity. Neither do I say if several bidders are employed by the vendor, in that case a court of equity would compel the purchaser to carry the agreement into execution; for that must be done merely to enhance the price. It is not necessary for the defensive purpose of protection against a sale at an under-value."

Here we see a part of Lord Loughborough's reasoning in *Connally* v. *Parsons*, 3 Ves. 625, note, repudiated, and a part of it adopted, that part, namely, which holds, that one puffer but no more than one can be employed, if he is *privately* instructed not to go beyond a value fixed by the vendor; for this adoption of the views of Lord Loughborough is regarded as necessary in order to furnish the vendor "a protection against a sale at an under-value." We have seen what an obvious fallacy this is. For it is obvious that a rule of the common law courts disapproved by this case furnished just as perfect a "protection against a sale at an under-value." The property could be either put up at its value as estimated by the seller, or it could be publicly announced, that the seller would make one bid. Either of these modes obviously fair and open would furnish the vendor exactly the same protection against sacrificing his property, as would the secret employment of a puffer. And is not the rule laid down by Sir William Grant obviously one, which, while it furnishes the vendor not a particle of protection beyond what the rule laid down by the common law courts furnish, may be readily so abused as to be an instrument of fraud?

It is admitted, that, if the puffer is employed to enhance the price beyond its fair value that is fraudulent; but if employed to run the property up to its fair value, then it is not fraudulent. But who is to determine whether or no his instruction is to run it up only to its fair value? I understand Sir Wm. Grant to say, the vendor. Suppose then he fixes the price really beyond its market-value, and then

makes repeated bids "to screw up the price" to this fixed sum beyond the market-value. This Sir Wm. Grant says is not fraudulent, but how it differs except in mere form from what is admitted to be fraudulent, I confess I am unable to see. If the puffer is privately instructed to bid the property up to a certain price no matter how large, this is not fraudulent; but if the price, to which he is to bid up the property is not named, this is fraudulent. What difference does it make to the *bona fide* bidder what his private instructions have been? The fact, that he in effect represents himself as a *bona fide* bidder, while in fact he is only a puffer, is what constitutes the fraud. And this exists no matter what were his private instructions. In the one case as much as in the other he has deceived the *bona fide* bidder by fraudulently representing himself to be a *bona fide* bidder when he was not. In either case the *bona fide* bidder is injured, and as much in the one as in the other. The distinction then attempted to be drawn between a puffer privately instructed to bid to a certain price and one not limited as to the amount he is to bid is merely ideal. The one is, it seems to me, as obviously fraudulent as the other. And neither is in the least degree necessary for the protection of the vendor. Both of them are weapons offensive in his hands and neither of them is in any degree needed by him, as is falsely assumed, as a defensive weapon.

In *Flint* v. *Woodin*, 8 Hare (41 Eng. Chy.) 618, the syllabus is: "Though a puffer ought not to be employed to screw up the price, or take advantage of the ignorance of other bidders, yet a progressive bidding to a fixed or reserved bidding by a person employed by the vendor, without the knowledge of the other bidders, will not necessarily be deemed to be taking advantage of their ignorance." In that case the purchaser at the auction had some days before the sale indicated to the vendor that he might give seven hundred pounds sterling for certain real estate and the vendor employed a puffer secretly with instructions to run the property up to six hundred and ninety-five pounds sterling and he bid upon the property through a long series of biddings to their final closing, when it was knocked down to the purchaser at seven hundred pounds sterling, he being the one who had indi-

cated he might give that price. There might have been under the circumstances of this case no taking advantage of the purchaser. But if the action of this puffer was not screwing up the price, which the vice-chancellor said ought not in any case to be allowed, then I know not what is the meaning of this phrase "screwing up the price." In truth the rule here laid down by the English chancery court like all its other rules in reference to puffing are impracticable. Their mode of application will necessarily depend upon the notions of the particular judge who decides the case. In almost any case two judges of good capacity might be expected to differ in their decisions, if they were governed by what are called rules by the English chancery court.

In *Woodward* v. *Miller*, 2 Col. Chy. 279 (33 Eng. Chy.), a puffer was employed to bid real estate to be sold at auction up to a certain price. At the sale the auctioneer declared that "it was a *bona fide* sale, and if there were any puffers in the room, he should hate himself." This was regarded as not equivalent to a representation, that the sale was to be without reserve, and though the puffer made repeated bids, the sale was specifically enforced. The vice-chancellor however offered to have the question, whether their contract was void at law tried in a court of law, and if found void, he said it would not be enforced in equity. But the purchaser declined to have this question tried in a court of law and preferred submitting it to the vice-chancellor. There can be no question but this contract of purchase would have been declared void in a court of law. I presume the purchaser regarded it as so plain a case, that he could safely submit it to the vice-chancellor. But in truth under the vague rules of the English chancery court no case could be plain, and therefore the purchaser ought not to have been surprised at the decision of the vice-chancellor, however contrary it may appear to the ideas, which any one would be likely to have of justice and right.

In the case of *Mortimer* v. *Bell*, 1 Law Rep. Chy. 10, it was decided that a vendor could not employ more puffers than one though they were limited to the same price, unless he expressly stipulated that he might, and Lord Cransworth, chancellor, from his opinion obviously disapproved of the

chancery rule permitting the employment of one puffer. He
says: "The conditions of sale in this case contained the
usual provision, that the highest bidder should be the pur-
chaser. Courts of law have held such a condition prevents
the vendor from interposing any reservation. *  *  *  *
It is not disputed that the vendor may stipulate for the power
of buying in the property, if it is going at a sum below what
he considers a fair price; but in the absence of such stipula-
tion courts of law hold, that it is a fraud in the vendor to
interpose any bidder to prevent property going to the person
who offers the highest price. This is certainly the rule estab-
lished in courts of law; but it is said a different rule prevails
in equity, and that without an express stipulation a vendor
may always fix a reserved price, and authorize a person to
bid for him, so as to prevent the property going under that
price. That such a rule to some extent prevails I cannot
doubt. Its existence has been recognized by many judges of
the highest reputation. Sir William Grant in *Smith* v. *Clarke*,
12 Ves. 477, 481, not only recognized but apparently approves
the rule. He seems to think it fair and just, that persons
putting up property for sale by auction should be at liberty
to employ a person to bid for them up to a stipulated price
to prevent its being sold at an under-value. When such a
right is stipulated for, there is no fraud, no deception. It is
said, that even without express stipulation such a right is
understood to exist. I confess I think it much better, that it
should be notified. If it be not notified, there is a differ-
ence between the language expressed and that which is
understood to be its import. The question in such case may
always arise, whether persons bidding were aware of the
rule. The practice of the court of chancery in modern times
at all events is to stipulate expressly for the right not to sell
under a fixed price, and so by implication to employ a person
to bid up to that price."

This decision was rendered in 1865; and we may gather
from it, that these impracticable rules with reference to
puffing, which had been laid down formerly by the chancery
court were found to work badly, and that the courts of chan-
cery to avoid the difficulties, which arose in their applica-
tion, had in modern times constantly stipulated in their

decrees, that any property ordered to be sold by the court should not be sold at less than a fixed price proclaimed before the auction commenced, which was in effect adopting a rule, which for eighty years had prevailed in the common law courts, when a seller of lands or other property decided to protect himself against a sacrifice of the property. The Lord Chancellor also expressed his disapprobation of the rules of the equity courts in reference to puffing and his preference of the rules of the courts of common law; because in his judgment the rules, which had been adopted by the courts of equity, tended to deceive bidders at auction. It is obvious that there never should have been different rules on this subject prevailing in the courts of common law and of chancery; and while the courts of chancery in modern times, as appears from their decisions, admitted the propriety of the rules laid down on the subject of puffing by the common law courts, yet they were obviously embarrassed by the decisions of the chancery courts which were binding on them as precedents.

To remove this trouble in 1867 an act of Parliament was passed entitled "the sale of land by auction act," the fourth section of which recites that "there is at present a conflict between Her Majesty's courts of law and equity in respect to the validity of sales by auction of land, when a puffer has bid although no right of bidding on behalf of the owner was reserved, the courts of law holding that all such sales are absolutely illegal, and the courts of equity under some circumstances giving effect to them; but even in the courts of equity the rule is unsettled, and that it is expedient that an end should be put to such conflicting and unsettled opinions" and it provides that after the passage of the act "whenever a sale by auction of land would be invalid at law by reason of the employment of a puffer the same shall be deemed invalid in equity as well as at law." The fifth section after reciting that "as sales of land by auction are now conducted, many of such sales are illegal and could not be enforced against an unwilling purchaser, and it is expedient for the safety of both seller and purchaser that such sale should be so conducted as to be binding on both parties," enacts "that the particulars or conditions of sale by auction of any land shall state whether

such land will be sold without reserve, or subject to a reserved price, or whether a right to bid is reserved; if it is stated that such land will be sold without reserve, or to that effect, then it shall not be lawful for the seller to employ any person to bid at such sale or for the auctioneer to take knowingly any bidding from any such person." By the sixth section it is enacted that "where any sale by auction of land is declared, either in the particulars or conditions of such sale, to be subject to a right for the seller to bid, it shall be lawful for the seller, or any one person on his behalf to bid at such auction in such manner as he may think proper."

As might naturally be expected the courts in the United States have to a considerable extent rendered conflicting decisions on the effect on a sale at auction of puffing, some following the rule of the common-law courts of England more or less modified, and others following the rules of the chancery courts of England more or less modified. Sometimes the decisions of the same court have been inconsistent, as for instance in *Steel* v. *Ellmaker*, 11 Serg. & R. 80, the case of *Bexwell* v. *Christie*, and Lord Mansfield's opinion therein, were criticised and disapproved. Subsequently this same court in *Pennock's Appeal*, 14 Pa. St. 449, overruled their previous decision and highly commended the decision in *Bexwell* v. *Christie*. Chief Justice Gibson delivering the opinion of the court says:

"It is impossible to doubt the principle of the civil law adopted by Lord Mansfield in *Bexwell* v. *Christie*. Good faith is an indispensable ingredient of fair dealing; and it is impossible to imagine a purpose consistent with it, for which sham-bidding is necessarily employed. The vendor may so prescribe conditions of sale which will enable him to return the property should it not come up to his price; and if he do not produce the effect openly, why should he do it covertly? Common honesty requires that all should be fair and aboveboard. To screw up the price, as it has been aptly termed, by secret machinery, can be no less than a fraud; and a sham-bidder can be used for no other purpose. The decisions on the subject have fluctuated; but the largest license allowed in any of them has been to employ a single puffer; yet whether there be one or whether there be twenty, the mis-

chief is the same, except as to the degree of it. It has been
said the employment of a plurality discloses too clearly to be
mistaken, not a design to protect the property from being
sacrificed, but to give an artificial impulse to the sale of it.
That touches the honesty of the vendor's motive; but what
have the bidders to do with it? Should he actually think
that not less than twenty could protect it, the sale would still
be, according to all the cases, fraudulent and void. It is not
his motive but his acts by which they are affected; and these
present a question not of actual but of legal fraud."

He also says: "The weight of authority is now as it was
at first in favor of the true principle. Whatever may have
been the state of the balance when Mr. Sugden collected the
cases in his treatise on Vendors, his own opinion, evidently
coincided with that of Lord Mansfield; and Chancellor Kent
expressly adhered to it. Against *Bramley* v. *Alt, Connelly* v.
*Parsons, Smith* v. *Clarke,* and *Steel* v. *Ellmaker,* we have in addi-
tion to *Bexwell* v. *Christie* and *Howard* v. *Castle* the modern
cases of *Crowden* v. *Austin, Wheeler* v. *Collier, Thornett* v. *Haines,
Meadows* v. *Tanner,* and *Veasie* v. *Williams.* After the English
judges have overruled three of their decisions we ought
not to be tenacious of our single one. I concurred in the
decision of *Steel* v. *Ellmaker* exclusively on the founda-
tion of precedent; but the balance of authority is conclu-
sively the other way and that case has neither principle nor
precedent to support it."

With this reasoning and conclusion of Chief Justice Gib-
son I entirely concur. He also makes some remarks in the
case of *Staines* v. *Shore,* 16 Pa. St. 203, which meet my
entire approbation. He says: "In the present case the ruling
judge instructed the jury that if the horse was actually worth
the sum paid for him, the buyer got the value of his money
and could not have been defrauded. The fallacy of the prin-
ciple is assuming that there is a standard of value indepen-
dent of the wishes and wants of the bidders and every man
is willing to buy by it. * * * What is the worth of any-
thing? The apophthegm of Hudibras answers truly 'just so
much money as it will bring.' A man is defrauded, when-
ever he is incited by artful means to bid more than he other-
wise would * * * for no fair purpose is the employment

of a puffer necessary and it must vitiate every sale in which recourse is had to it."

These views of Chief Justice Gibson are it seems to me the necessary results of the English common-law cases and the opinions of Lords Mansfield, Kenyon and Tenterden, which we have already quoted. The English common-law cases are fully sustained by the case of *Towle* v. *Levitt*, 3 Foster (23 N. H.) 367.

In the case of *Baham* v. *Buche*, 13 La. 287 it was held, that the owner of property may withdraw it, before the highest bid is accepted by the auctioneer, but has no right to bid himself, unless he publicly reserves this right. In delivering the opinion of the court Eastis, Justice, adopts the principles of *Bexwell* v. *Christie* and remarks: "The doctrine in that case has not been followed in all cases, but we apprehend that time and scrutiny will re-establish its force, whenever the principles of law and public morals are co-incident." To the same effect is *Correjoller* v. *Mossy*, 2 La. 607. It seems to me that the position in this case "that the owner of property may withdraw it before the highest bid is accepted by the auctioneer" is very reasonable and ought perhaps to be adopted, though it may not be a proper deduction from the English common-law cases, which lay down certainly the general principles which meet my hearty approbation.

In *McDowell* v. *Simms*, 6 Ired. Eq. 278, Pearson, Judge, makes some remarks, which, it seems to me, are very sound. After reviewing a number of English cases and saying that he inclined to the opinions expressed by Lords Mansfield and Kenyon, which I have before quoted, he says: "It is impossible, as Lord Loughborough and Sir William Grant attempted to do, to run a dividing line so as to say when this by-bidding is intended for puffing and when merely to prevent property being sacrificed. In the nature of things any by-bid tends to inflate the price more or less, except it be announced to be a bid for the owners of the land."

In the *National Bank of Metropolis* v. *Sprague*, 20 N. J. Eq., it was decided: "That the employment of puffers by creditors, in whose behalf property is offered for sale at public auction, for the purpose of increasing the price by fictitious

bids is a fraud upon honest bidders; and a buyer at such sale can be relieved from his purchase." In the case of *Reynolds* v. *Dechaums*, 24 Tex. 174, the spirit of the English cases on the subject of puffing appears to be approved. But in *Veazie* v. *Williams*, 8 How. 153, the rule of the English common law courts as to the effect of puffers on a sale at auction was approved by the Supreme Court of the United States.

There is no decision in this State or in Virginia which touches the question under consideration except the case of *Hinde* v. *Pendleton*, Wythe's Reports 145, in which Chancellor Wythe entertained views on puffing not unlike those of Lord Mansfield. He says on page 146: "The act of bybidding is a *dolus malus*: 1. The by-bidder offering a price for the thing proclaimed to be sold professeth a wish to buy it; which profession is false for he not only doth not wish to buy the thing but wishes another man to buy it and tempteth him to bid for it. 2. The by-bidder instead of being one who would be a buyer is in truth the seller disguised." The Chancellor set aside the sale in that case, because a puffer bid at it.

From this review of the authorities it appears to me, that the weight of the authorities in the United States sustain the rules in reference to the effect of puffing laid down by the English common law courts rather than those laid down by the English chancery courts. And in view of the fact that after nearly a hundred years of experience and a vigorous pressing of their respective advocates of these opposing rules with reference to the effect of puffing there has been an abandonment in England of the rules laid down by the chancery courts and a candid admission by its advocates of the superior excellence of the rules laid down by the common law courts, it seems to me, we cannot hesitate to adopt them, especially as they are based on better reason and are more definite and easy of application and tend to the promotion of honesty in the dealings of mankind. It will be observed, that most of the cases, where there have been by-bidders, they were employed by the owners of the property about to be sold at auction, that is, were puffers in the strict sense of the word. But it is obviously unimportant, whether

the by-bidder is employed by the owner of the land or by some one else having a pecuniary interest in the auction about to be made, and who stands in such a relation to it, that he can make good his assurance to the by-bidder, that he shall not be held responsible for his bid, if it happen to be the highest bid made. The real essence of the fraud is not that the owner is bidding for the property, but it consists in the fact, that a by-bidder pretending to be a *bona fide* bidder deceives honest bidders, raises the price of the property by fictitious bids increasing competition, while he himself has good reason to believe and does believe, that he is secure from any risk of being held personally liable for his bids. It is immaterial, from whom he derives this assurance of immunity, provided the party giving the assurance expressly or impliedly has the power either legally or practically to make good the assurance.

The conclusions therefore which I reach are: If the owner of goods or of an estate put up for sale at auction employs one or more puffers to bid for him, or if a by-bidder be employed by any one interested in such sale, and such by-bidder has assurances expressed or implied that neither he nor his employer shall be held responsible for his bid, should it happen to be the highest bid, either from the auctioneer declining to knock the property down to him or otherwise, and the legal or moral power exists in his employer to make good this assurance, then a single bid made by such puffer or by-bidder is a fraud on the sale, and the highest bidder cannot be compelled to comply with his contract. It makes no difference, that such puffer or by-bidder was employed to prevent a sacrifice of the property and was directed to bid it up to a fixed price only; nor does it make any difference, that the property only sold at a reasonable price. The purchaser in any such case has a right to repudiate the sale, if he does so promptly, as soon as he ascertains that there was such puffer or by-bidder who bid at the sale.

It only remains to apply this law to the facts proven in this case. I have in the statement of the case deemed it unnecessary to state any of the facts, which bear upon any of the questions in this cause excepting only the one ques-

tion, that is, the effect upon a sale at auction of the employment of a puffer or such by-bidder as I have described. I have therefore omitted all the evidence taken either to support or controvert the questions raised by the supplemental answer of Henry K. List. This question is, whether Susannah Lewis really has any lien on any portion of the Grant House property, or whether her relation to it is merely that of the owner of an individual moiety of the property subject to certain liens, for the payment of which it was in part sold. As a consequence of my opinion that this cause must be decided in the same manner, whether she is such creditor or not, it follows of course that the filing of the supplemental answer was, to say the least, unnecessary; and therefore it is unnecessary to consider, whether the court below erred or did not err in permitting it to be filed against the objection of the plaintiff. I deem it also unnecessary to consider, whether the wife of Louis Woodmansee is or is not a competent witness, as according to our views her testimony can not possibly affect the decision of this cause.

According to the principles, which we have laid down, the puffing of the auction sale will affect the validity of the sale, if George R. Tingle was a puffer employed by Mrs. Susannah Lewis privately to bid for her, if she was a creditor and as such entitled to a portion of the proceeds of the sale, to the same extent as if she was not a creditor but only a part owner of the land sold and as such entitled to a portion of the proceeds of such sale. For if there was an understanding either expressed or implied, that neither he nor his principal, Mrs. Susannah Lewis, should be held responsible for his bids if the property was knocked down to him, he was such a by-bidder, as put him in exactly the same position, so far as his bids would affect the validity of the sale, as if he had been a puffer in the strictest sense of the word. This private understanding was had by him with Louis Woodmansee, the agent of Susannah Lewis, and she certainly occupied a position, whether she was a creditor or not, which would enable her to make good an assurance, that he should not be responsible for his bids, if the property was knocked down to him, for if it should by reason of his bids be proposed to knock it down to her, she possessed the completest power whether as

creditor or not to prevent its being knocked down to her. This auction sale by the trustee, Peck, was made upon her requirements alone, and of course prior to the first day of sale, May 14, 1881, she had the power to direct that no such sale should be made; and when on that day an agreement was entered into by all the parties interested in this sale, it was expressly stipulated in it: "But nothing herein contained is to be construed to require a sale by Peck, trustee, unless with the consent of Mrs. Susannah Lewis or be construed to enable any one to require a sale by the trustee, who was not heretofore authorized to require such sale." It is obvious that this put the trustee, Peck, under the absolute control of Mrs. Susannah Lewis at the auction-sale on the 21st of May, 1881. He could obviously make no sale on that day, which did not meet her approbation. He could not have the property knocked down to her puffer, Tingle, nor to herself, unless she chose to permit him to do so.

Mr. Peck perfectly well so understood his position. For though the bids in the morning amounted to nearly twenty-six thousand dollars, and though, as he said to Louis Woodmansee, he was well satisfied no more could be got for the property, and it was a large price, more than any of the parties expected to get for the property, yet he did not feel himself at liberty to direct the property to be knocked down at this satisfactory price, because Louis Woodmansee as the agent of Mrs. Louis Woodmansee informed him, that she did not desire it, as the bids were not binding on the parties, who made them under a private arrangement with Mrs. Susannah Lewis. When he was so informed, he had nothing to do except with the assent of Mrs. Susannah Lewis to set the property up for sale without any regard to these previous satisfactory bids. And though Henry K. List bid for it afterwards more than three thousand dollars less than had been bid for it in parcels in the morning, yet by her direction he had it knocked down to him as the highest bidder. Tingle or his principal Susannah Lewis, if upon the evidence she is to be regarded as his principal, as is contended for by the plaintiff's counsel, or Susannah Lewis and Louis Woodmansee his principals, as contended for by the counsel of Henry K. List, the purchaser, could obviously none of them be made by the trustee, Peck,

even had he desired so to do, responsible for the bids of Tingle either in the morning or in the evening of the 21st of May, 1881.    Therefore it follows from the principles, which we have laid down, that he was a puffer, substantially, and that he would still occupy this position of a puffer, whether Mrs. Susannah Lewis was or was not a creditor, and whether he was the agent of Susannah Lewis or was the agent of Susannah Lewis and Louis Woodmansee jointly. These questions so much litigated in this cause and so fully discussed by counsel in this Court are, it seems to me, very unimportant questions, and however they were determined, they would not alter the decision in this cause.

The decision to be rendered must depend upon the question, whether regarding George R. Tingle as a puffer his bidding at this auction sale vitiated it and requires the court to decline to specifically enforce against List his contract of purchase, which arose from this Grant House property being knocked down to him as the highest bidder at this auction sale. Various reasons are assigned by the counsel for the plaintiff, the trustee, Peck, why this contract of purchase should be enforced against List, though Tingle was a puffer at this sale. In the first place it is contended, that there was but one puffer at this sale.    This is controverted by the counsel of List.    There were, it is clearly proven, but three bidders at this sale either in the morning or in the evening—Henry K. List, George R. Tingle and Jeff. Bowers.    It has, as we have seen, been fully proven, that Tingle was a puffer.    There is no direct proof as to whether Jeff. Bowers was a *bona fide* bidder or a mere puffer.    He lives in Ohio within a mile or two of Wheeling, and yet his deposition was taken by neither party in this suit.    This certainly gives rise to a suspicion that he was a puffer.    For Louis Woodmansee at whose instance the plaintiff, Peck, instituted this suit certainly knows he was not a puffer, if this be the truth; for if he was a puffer there is no question he was employed by Louis Woodmansee. He could, as the evidence shows, have been employed by no one else, Mrs. Susannah Lewis being an aged lady, who never attends to any business, but leaves all her business to be managed by her son-in-law, Louis Woodmansee.    Again Louis Woodmansee's deposition has not been taken, though

he of course could have informed the court, whether
Jeff. Bowers was or was not a puffer. Again it is
proven that Jeff. Bowers is a livery stable keeper, and we
know that according to the views of Louis Woodmansee
it was highly important to have at this sale as a puffer a
livery stable keeper. Because nothing would so press Henry
K. List to bid a high price for this property as the fear that
the lot immediately in rear of a dwelling house owned by
Henry K. List would fall into the hands of some one, who
would build upon it a livery stable, which would be a great
detriment to this dwelling house. Accordingly we find Louis
Woodmansee earnestly soliciting two different livery stable
keepers to attend the sale as puffers and bid on this lot imme-
diately in rear of the house of Henry K. List. He did not
however get from either of them such a satisfactory assurance,
that they would act at his instance in this capacity as he
thought desirable. And while there is no direct proof, yet
these circumstances do give rise to the suspicion, that when
another livery stable keeper living in Ohio in a village near
Wheeling appears as a bidder at this auction, he might be a
puffer, especially when the plaintiff could with perfect ease
have proven the contrary, if it were true.

Still the presumption of course is that every bidder at an
auction sale is a *bona fide* bidder, till the contrary appears.
But of course this fraud of attending an auction sale as a
puffer may like any other fraud be proven, as it generally
must be, by circumstantial evidence. The only question
is, do the circumstances here satisfactorily lead to the con-
clusion that Jeff. Bowers was a puffer? They raise a strong
suspicion but I cannot say that they satisfy my mind that he
was. He might for anything which appears have been a
*bona fide* bidder. He is entitled to the presumption that he
was such; and I do not think that this presumption has been
overthrown. But while the English chancery courts formerly
held and some American cases have given countenance to the
idea, that to vitiate an auction-sale there should be present
at it more than one puffer, yet the decided weight of au-
thority both English and American is opposed to this view.
This being the case and as George R. Tingle is clearly
proven to have been a puffer at this sale, it becomes

comparatively unimportant, whether Jeff. Bowers was or was not.

Again, it is insisted that the son of Henry K. List who bid for him on this property well knew, that the morning bids of nearly twenty-six thousand dollars had been totally abandoned, and that the property was put up as a whole to be sold precisely as if no sale of it in parcels had been attempted in the morning. He testifies that this is not true; that he endeavored to find out whether it was so or not; and that he inquired of the counsel of the plaintiff on the subject but got no satisfaction. If it was true, as it now turns out, that the trustee had made up his mind to abandon entirely the morning bids and treat them as if they had never been made, it was his obvious duty to have it announced by the auctioneer and to have it proclaimed, that the property would be knocked off to the highest bidder in the afternoon, whether the bid amounted to twenty-six thousand dollars, the aggregate amount of the bids on the different parcels, or not. And it does seem to me reasonable to believe that this omission to make the announcement was designed, so as to leave bidders and especially List in doubt upon this important point. But suppose, as the plaintiff's counsel contends, there was sufficient reason to satisfy List or his agent, his son, that these morning bids had been really totally abandoned and were to be treated by the trustee, Peck, as if they had never been made, and that the property would be sold as a whole, whether it brought the amount of these bids (twenty-six thousand dollars) or not; and suppose List or his agent, his son, did so believe, though they both deposed that they did not, what effect would this justly have on the decision of this cause?

The fact would still remain that George R. Tingle, a wealthy man, who had recently sold property, and who might well be supposed by others to be seeking a new investment, had made very large bids for the greater part of this Grant House property in the morning. And Henry K. List or his agent, his son, believing, as the testimony shows, that he was a *bona fide* bidder and wanted this property at the prices he had bid for it might well infer that if he, List, should buy the whole of this property, he could at once dispose of by far the greater part of it at a higher price to Tingle, a first-rate

man. Under this belief it is obvious that List might well give for the whole property a much larger price, than he otherwise would have done, because he had by these puffing and fraudulent .biddings of the morning been induced to believe, that he could at once dispose of that portion of the property, which he did not specially want, and retain the portion he did want reducing in this manner its cost to him to a moderate price. Is it not obvious therefore, that the setting up the property as a whole in the evening, even had it been distinctly understood by List that the morning biddings were entirely abandoned, would not prevent the fraudulent biddings of Tingle in the morning from operating as a fraud on List in the evening?

It is said however that this ought to have satisfied List that the bids of Tingle in the morning were fraudulent. He and his son both testify, that they did not have the least suspicion that they were fraudulent but believed them to be *bona fide*. They were certainly intended by him to be so regarded, and surely Woodmansee and Tingle must have had what they deemed sufficient reasons to suppose that the fraud was so concealed, as that it would not be suspected, and I have no doubt that in this they were right, and that List and all others believed as the trustee, Peck, did, that they were *bona fide*. Peck testifies that he had no suspicion that they were not *bona fide* till informed at noon by Louis Woodmansee, that they were fraudulent. It was his duty then to have announced this in the evening and thus informed List and all others of a matter in which they were deeply interested and had a right to know. The plaintiff, Peck, having failed to do so, this Court will not assume against the oaths of List and both his sons, that they really knew that these morning bids of Tingle's were fraudulent. Especially as Tingle informed the son of List before the property was knocked down that his bid in the evening was *bona fide*. It is said, that the son of List was informed by Woodmansee before the property was knocked down, that it would probably be knocked down to him. But it is not pretended, that the information had been given, until after he had made his last bid; and he not unnaturally supposed he was bound by that bid.

It is insisted, that the evidence shows that the property was worth all that List bid for it, and therefore he was not injured by the fraud which had been practiced on him. But he was obviously injured if he gave more for it than he would have had to give but for this fraud, whether he in fact gave much or little for this property. The authorities we have cited show this to be the law, if really a proposition so clear needed any authoritity to sustain it.

It is further claimed, that when the memorandum of sale was signed the defendant List knew all the material facts in this case and then knowing them he elected to take the property at twenty-two thousand seven hundred dollars and cannot now retract this election. The evidence shows clearly, that this position is not sustained by the facts. What is deposed to by the trustee Peck with reference to the admission by Woodmansee to him, that the bids in the morning were all fraudulent, was certainly a most important fact bearing on the question, whether List was bound by his bid. This fact not then known to List and the failure of the trustee to make it known before the sale of the afternoon are the most material facts in this case bearing on the obligation of List to comply with his contract. There is no pretence that when this memorandum of sale was signed by the agent of List, he had the least suspicion of the existence of these facts. It seems to me therefore that there was puffing at this sale, which vitiated it and rendered it fraudulent, and that none of the circumstances surrounding the case prevented List from insisting that he was not bound by this contract.

I am therefore of opinion that the court below did not err in dismissing the plaintiff's bill. There was in the decree a clause declaring that Daniel Peck do pay to the defendant Henry K. List his costs by him expended excepting fifty-five dollars of the costs of depositions in this cause on behalf of the defendant Henry K. List. This is a very unusual provision as to the costs, but I cannot say in this case that it is erroneous, as there are a large number of depositions in this cause taken by Henry K. List, which have little or no bearing on the merits of the controversy, and which I have taken no notice of in the statement of this case. The decree of April 8, 1882, should therefore be affirmed; and the appellee

should recover against the appellant his costs about his suit in this Court expended and thirty dollars damages.

AFFIRMED.